### The PEOPLE of the State of Colorado, Complainant,

v.

### John J. GIBBONS, Attorney-Respondent.

### No. 83SA277.

Supreme Court of Colorado,
En Banc.

July 2, 1984.

---

Linda Donnelly, Disciplinary Prosecutor, George S. Meyer, Deputy Disciplinary Prosecutor, Denver, for complainant.

Michael F. Morrissey, Denver, for attorney-respondent.

NEIGHBORS, Justice.

The respondent, John J. Gibbons, was charged in a two-count amended formal complaint with violating C.R.C.P. 241.6 and various provisions of the Code of Professional Responsibility. The complaint arose out of the respondent's representation of seven co-participants who were arrested

and charged with numerous crimes committed in Jefferson and Boulder counties, and his conduct during the investigation of an informal complaint filed by two of the seven persons.

The Grievance Committee found that the respondent had represented multiple co-defendants, that he had engaged in a covert sexual relationship with one of the defendants whose husband was also a co-defendant, and that he had caused false and misleading information to be submitted to the Grievance Committee in connection with the informal complaint proceedings which preceded the filing of formal charges. The Grievance Committee concluded that the respondent's conduct violated DR1–102(A)(2)–(6); DR5–101; DR5–101(A); DR5–105; DR5–105(A)–(B); and DR7–101(A)(3). Based on these findings and conclusions and the respondent's prior disciplinary record,[1] the Grievance Committee recommended that the respondent be disbarred and assessed the costs of these proceedings.

The respondent has filed exceptions to the report of the Grievance Committee. He has also filed a petition requesting that he be transferred to disability inactive status pursuant to C.R.C.P. 241.19(a) and (d).

## I.

### Introduction

We glean the following relevant facts and procedural history from the record. The respondent was admitted to practice law as a member of the bar of this court on September 19, 1938. He is registered as an attorney with this court and, therefore, is subject to our jurisdiction.

On January 19, 1981, seven persons (three men, two women, and two juveniles) were arrested in connection with the investigation of a series of burglaries which had occurred in Jefferson County. Those arrested and their relationships are: KENNETH and KELLY O. (husband and wife), MARY W. and FRANK W. (cohabitants) (Frank W. is Kelly O.'s brother and Mary W. is the aunt of Kelly O. and Frank W.), RANDY C. (unrelated), and DARREN and DERRICK T. (Mary W.'s minor children). All of those arrested were jailed in Jefferson County. The two women were the first of the five adults released on bond. A cell mate of Frank W. recommended that the defendants hire the respondent to represent them. As a result, Kelly O. and Mary W. arranged to see the respondent on January 20 or 21, 1981. The respondent agreed to represent all of the co-defendants and was paid a retainer of $800.[2] Thereafter, multiple charges were filed against all seven persons in Jefferson and Boulder counties.[3] The charges can be described generically as burglary, theft, theft by receiving, and conspiracy.

Kenneth O. was charged with more than twenty felonies in Boulder and Jefferson counties. He pleaded guilty to three of the charges and was sentenced to probation. Kelly O. was charged with ten felonies, pleaded guilty to two and was sentenced to probation. Mary W. was charged with seven felony counts in Jefferson County, pleaded guilty to one and was sentenced to probation. Randy C. was charged with at least sixteen felonies, including second-degree assault and a crime of violence. He retained separate counsel to represent him in June of 1981. Randy C. later pleaded guilty to two felony counts and was sentenced to probation. As of the date of the hearing before the Grievance Committee, Frank W. had also retained other counsel and his cases were unresolved, but a tenta-

1. In *People v. Gibbons*, 157 Colo. 357, 403 P.2d 434 (1965), the respondent was suspended indefinitely following his conviction in the Federal District Court on six counts of federal income tax evasion and perjury.

2. In addition to the retainer, the respondent was paid approximately $1000 in attorney's fees during his representation of the seven persons.

3. Some or all of the co-participants were arrested on February 23, 1981, by officers from the Boulder County Sheriff's Department and the Northglenn Police Department in connection with the crimes which had been committed in Boulder County.

tive plea agreement had been reached. He was charged with five felony counts and one misdemeanor, and was also the subject of extradition proceedings commenced by the State of Missouri. Apparently, the petitions in delinquency filed against the two juveniles were dismissed.

Shortly after being retained, the respondent initiated a sexual relationship with Kelly O. The covert relationship continued until July 13, 1981, when Kelly and Kenneth O. entered pleas of guilty pursuant to a plea agreement in the Jefferson County District Court. Following the completion of the court proceedings on that day, the respondent and Kelly O. went to a hotel in Golden, Colorado. The respondent gave a fictitious name when he signed the guest register. That occasion marked the last time the respondent and Kelly O. engaged in sexual activity. When she returned home on July 13, 1981, Kelly O. told Kenneth O. of the relationship between her and the respondent. On July 15, 1981, Kenneth and Kelly O. filed their complaint against the respondent with the Grievance Committee.

In their informal complaint, Kelly and Kenneth O. alleged that the respondent had "blackmailed" them by requiring Kelly O. to have sexual relations with him as a condition of his representation of them in the criminal proceedings; that the respondent had represented seven co-defendants in the same criminal case; that the respondent made the disposition of Frank W.'s criminal cases and release from custody contingent upon sexual relations with Kelly O.; that the respondent had threatened Kenneth and Kelly O. with physical harm if they refused to cooperate with him; that the respondent had used false identification in connection with his meetings with Kelly O.; that the respondent solicited Kenneth O.'s assistance in doing physical harm to one of the other co-defendants to prevent that person from revealing to respondent's wife his relationship with Kelly O.; and that the respondent coerced the complainants into entering pleas of guilty in the criminal cases.

The informal complaint was received by the respondent on August 6, 1981. The answer submitted by the respondent to the informal complaint impliedly denies any sexual relationship with Kelly O.

The respondent's exceptions to the Grievance Committee's report and recommendations include the following assertions: (1) The evidence was not sufficiently clear and convincing to support the recommendation of disbarment. (2) Only two of the five adults represented by the respondent filed a complaint against him with the Grievance Committee. (3) Neither complainant has sought any post-conviction relief to set aside their guilty pleas. (4) The illicit sexual relationship had no effect on the respondent's representation of the defendants. (5) The witnesses who testified against respondent "are unworthy of credibility." After the exceptions were filed, but before his opening brief was due, the respondent filed the petition for transfer to disability inactive status. We deferred ruling on his petition until now.

## II.

### Petition for Transfer to Disability Inactive Status

As a preliminary matter, we will address the respondent's request to be placed on disability inactive status under C.R.C.P. 241.19(a) and (d). In his petition, the respondent claims that he "is unable to fulfill his professional responsibilities competently because of illness." We conclude that the respondent has not made a satisfactory showing of a colorable disability claim pursuant to C.R.C.P. 241.19. Rather, the medical reports and other materials submitted by the respondent in support of his petition suggest that he is in the process of retiring from the practice of law. Therefore, upon his retirement, which the respondent states is imminent, he will have no professional responsibilities to discharge. Moreover, the respondent's petition would have a louder ring of sincerity if it had not been filed just shortly before his opening brief was due in this court, after he had fully exercised all of his rights in

proceedings before the Grievance Committee.

■ We are persuaded that the petition is little more than a last ditch effort by the respondent to avoid our consideration of the discipline recommended by the Grievance Committee. Whether we grant such a petition or accept a tendered resignation from an attorney who is the subject of disciplinary proceedings is a matter solely within our discretion. *See People v. Pacheco,* 198 Colo. 455, 608 P.2d 333 (1979); Annot., 54 A.L.R.2d 1280 (1957). We elect to exercise our discretion in the circumstances of this case by denying the respondent's petition.

### III.

#### *Standard of Review*

■ We first restate the rule that the disciplinary recommendation of the Grievance Committee is advisory only and is not binding on this court. *E.g., People v. Mattox,* 639 P.2d 397 (Colo.1982). This case, however, does present an issue of first impression. We have not decided what standard of review to apply in determining whether the charges of misconduct have been proved by clear and convincing evidence as required by C.R.C.P. 241.14(d). There are at least three possible alternatives. First, we could adopt the rule that the Grievance Committee's findings will be upheld if there is sufficient evidentiary support based on the record as a whole. *See, e.g., In re Estes,* 390 Mich. 585, 212 N.W.2d 903 (1973); *In re Wright,* 131 Vt. 473, 310 A.2d 1 (1973). Second, we could follow the approach used by the California Supreme Court and adopt the rule that we are not bound by the Grievance Committee's findings of fact and will pass upon the sufficiency and weight of the evidence. *See, e.g., Reznik v. State Bar,* 1 Cal.3d 198, 81 Cal.Rptr. 769, 460 P.2d 969 (1969). Under the California procedure, the burden is upon the party seeking review of the Grievance Committee's recommendation to show that its findings are not supported by the evidence or that the recommendation is erroneous or unlawful. *Id.* Third, we could

conduct a de novo review of the record and make independent findings of fact and conclusions of law. *See, e.g., Committee on Professional Ethics v. Durham,* 279 N.W.2d 280 (Iowa 1979); *In re Chambers,* 292 Or. 670, 642 P.2d 286 (1982); *In re Farris,* 229 Or. 209, 367 P.2d 387 (1961); *In re Green,* 470 Pa. 164, 368 A.2d 245 (1977).

We believe the first alternative is the most appropriate, in view of the procedures we have adopted to govern attorney discipline and in order to be consistent with the disciplinary provisions which govern other professions. Proceedings before the three-member hearing board of the Grievance Committee are governed by C.R.C.P. 241.-14(d). That rule provides that hearings shall be conducted in accordance with the Colorado Rules of Civil Procedure and the Colorado Rules of Evidence. The rule further requires that the disciplinary prosecutor prove the charges against the respondent-lawyer by clear and convincing evidence. At the conclusion of the hearing, the hearing board is required to prepare a report which contains its findings of fact and recommendation. C.R.C.P. 241.15(a). The report is submitted to the hearing panel which must review the report. The hearing panel is required to accept the hearing board's findings of fact unless "it determines that such findings are clearly erroneous," based on the panel's own review of the record. C.R.C.P. 241.15(b). In addition, the hearing panel may modify the hearing board's recommendation without reviewing the record, but must state the reasons for the modification. If the matter is referred to the supreme court by the hearing panel pursuant to the provisions of C.R.C.P. 241.15(b)(3), this court has reserved to itself the plenary power to review any determination made in the course of a disciplinary proceeding and to enter any appropriate order. C.R.C.P. 241.15(c).

■ Most, if not all, of the Colorado statutes regulating discipline in other professions include a provision for judicial review of any disciplinary action taken by the governing board in accordance with the

Administrative Procedure Act, section 24–4–106, 10 C.R.S. (1982).[4] Under section 24–4–106(7), 10 C.R.S. (1982), a court may not overturn an administrative agency's factual findings, when considered in light of the whole record, unless they are clearly erroneous and unsupported by substantial evidence. *See Lee v. State Board of Dental Examiners,* 654 P.2d 839, 843 (Colo. 1982). We see no reason to adopt a different standard for lawyers. This test strikes the proper balance between the interests of the public and the lawyer who is the subject of the disciplinary proceeding. Accordingly, we hold that the factual findings of the Grievance Committee are binding upon this court unless, after considering the record as a whole, we conclude that they are clearly erroneous and unsupported by substantial evidence. *See People ex rel. Kent v. Denious,* 118 Colo. 342, 196 P.2d 257 (1948).

## IV.

### Representation of Multiple Defendants

We first summarize the additional facts which are pertinent to the Grievance Committee's determination that the respondent improperly represented multiple defendants in criminal proceedings. Frank W. and Mary W. arrived in Colorado in November of 1980. Frank W. immediately began committing burglaries and thefts and stored the fruits of his illegal activities in the basement of the house in which he and Mary W. lived. Kenneth O. joined Frank W. in committing burglaries after he and Kelly O. came to Colorado in late December 1980. Randy C. participated in the burglary ring with Kenneth O. and Frank W. after he got to Colorado in January of 1981. His participation was limited to the period of time from approximately January 11, 1981 to January 19, 1981. The male defendants resided with the female defendants during most of the time when the burglary ring was in operation. The women may have been aware of the crimes committed by the men, particularly in view of the fact that substantial personal property was stored in Mary W.'s house.

The Grievance Committee found there were significant differences in culpability among the various defendants. The women did not participate in the burglaries. Randy C. was present in Colorado for only one week before he was arrested, as contrasted with the other defendants who may have been guilty of crimes which occurred over a two-month period. Incriminating writings prepared by one or both of the women implicated Kenneth O. and Frank W., but not Randy C. Randy C. lived with the other four defendants for only a short period of time. He expressed his displeasure with the discussion of all the defendants' cases at a meeting between the deputy district attorney, the defendants, and the respondent during which plea agreements were discussed. The Grievance Committee concluded that "the variance in culpability, proof, defenses, background, potential penalty, and possible defense strategies among the five codefendants was a differing interest as defined in DR 5–105(A) and (B) and DEFINITIONS (1) of the Code of Professional Responsibility." We agree with this conclusion.

The respondent suggests two reasons why his multiple representation of the co-defendants did not contravene the provisions of the Code. First, he argues that each of the five adults gave his or her consent to being represented by the same attorney. Second, he claims that none of the persons whom he represented suffered any harm or prejudice.

The respondent testified that he advised the five adults that they were free to obtain separate counsel. The respondent also told the Grievance Committee that he made a full disclosure of the potential conflicts of

---

4. *See, e.g.,* section 12–35–115, 5 C.R.S. (1983 Supp.) (dentists); section 12–36–119(2), 5 C.R.S. (1983 Supp.) (physicians); section 12–38–120(6), 5 C.R.S. (1983 Supp.) (nurses); section 12–40–119(2)(e), 5 C.R.S. (1983 Supp.) (optometrists); section 12–43–111(3)(f), 5 C.R.S. (1983 Supp.) (psychologists); section 12–22–125(3), 5 C.R.S. (1983 Supp.) (pharmacists); section 12–2–127(1), 5 C.R.S. (1978) (accountants).

interest which might arise from the multiple representation and the effects of such conflicts.

Four of the five adults testified that the respondent did not advise them of any potential conflict in their interests. Randy C. told the hearing board that the respondent explained only that each of them could get separate lawyers. Indeed, the county judge who advised the defendants of their rights appointed separate counsel for each defendant. It also appears that the county judge expressed reservations to the respondent's associate (a "law assistant") about the multiple representation when the five defendants appeared in court on a later occasion and informed the judge that they would be represented by the respondent. Regardless of whether the respondent informed the defendants of their right to individual counsel, the record fails to establish that any further disclosure was made by the respondent to his clients. The respondent chose the strategy of group representation for the purpose of keeping his clients together "as a family." Based on this conflicting evidence, the Grievance Committee properly concluded "that the Respondent did not make full disclosure of the nature of the conflict of interest and of the possible effect of such representation on the exercise of his independent professional judgment to each of the multiple clients ... and that each codefendant did not voluntarily, knowingly and intelligently relinquish his right to conflict-free representation."

The respondent's second argument can be labeled as the "no harm, no foul" defense.[5] We reject this theory of defense in a lawyer discipline proceeding. Assuming the client is not prejudiced by the lawyer's violation of the Code, that fact is only one of mitigation. We also conclude that the respondent's argument that the complainants' constitutional rights to counsel were not compromised is inapposite in a grievance proceeding. We stated recently in *People v. Castro*, 657 P.2d 932, 943–44 (Colo.1983) (quoting *Holloway v. Arkansas*, 435 U.S. 475, 490–91, 98 S.Ct. 1173, 1182, 55 L.Ed.2d 426 (1978)):

> [I]n a case of joint representation of conflicting interests the evil—it bears repeating—is in what the advocate finds himself compelled to *refrain* from doing, not only at trial but also as to possible pretrial plea negotiations and in the sentencing process. It may be possible in some cases to identify from the record the prejudice resulting from an attorney's failure to undertake certain trial tasks, but even with a record of the sentencing hearing available it would be difficult to judge intelligently the impact of a conflict on the attorney's representation of a client. And to assess the impact of a conflict of interests on the attorney's options, tactics and decisions in plea negotiations would be virtually impossible. Thus, an inquiry into a claim of harmless error here would require, unlike most cases, unguided speculation.

(Emphasis in original.) The constitutional analysis under the sixth amendment is often result oriented because it focuses upon the attorney's performance after multiple representation occurs to determine whether the representation was constitutionally sufficient. *See, e.g., Cuyler v. Sullivan*, 446 U.S. 335, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980). On the other hand, the ethical obligations imposed on defense counsel by the Code address the conflict of interest question at the time the lawyer accepts employment by multiple defendants in a criminal proceeding. Thus, the conflicts of interest forbidden by Canon 5 of the Code are more protective of both the clients' and society's interests than is the remedial standard of the sixth amendment. *See* Geer, *Representation of Multiple Criminal Defendants: Conflicts of Interest and the Professional Responsibilities of the Defense Attorney*, 62 Minn.L.Rev. 119 (1978).

---

5. The attorney-witnesses who testified before the hearing board opined that the dispositions of the criminal charges arranged by the respondent were satisfactory. However, a Jefferson County Deputy District Attorney stated that she would confess a motion to withdraw pleas if one were filed by either Kenneth or Kelly O.

## V.

### Inappropriate Personal Relationship With a Client

At the time he engaged in the covert sexual relationship with Kelly O., the respondent was 66 years of age and Kelly O. was 23 years old. The respondent was a licensed attorney and Kelly O. had completed the ninth grade. The client was a defendant in a criminal proceeding which is a stressful situation. The Grievance Committee concluded that early in the representation the respondent inquired of others about Kelly O.'s sexual habits and initiated the relationship with her. The meetings between the respondent and Kelly O. occurred several times weekly at the respondent's office and at various motels. The Grievance Committee found that the respondent did not force the sexual relationship upon Kelly O., but stated that she was placed "in a position in which she was unduly dependent on Respondent and in which she may not have been able to exercise free choice." In view of the fact that the respondent has conceded that his relationship with Kelly O. violated DR5–101(A) and DR7–101(A)(3) and has taken no exception to the Committee's conclusions or findings on this issue, it is unnecessary for us to discuss this matter further.[6]

## VI.

### Misconduct in Connection With Grievance Proceedings

After the respondent received the informal complaint from the Grievance Committee, he submitted to the Grievance Committee affidavits prepared by personnel in his office and signed by Mary W. and Frank W. At the hearing both persons testified that many of the statements made in their respective affidavits were not true and generally repudiated their contents. The affidavit of Mary W. submitted to the inquiry panel contained the following statements:

(5) To the best of my personal knowledge, no such relationship exists between John J. Gibbons and Kelly [O.], other than that of Attorney/Client.

. . . .

(7) That to the best of my knowledge the charges against Mr. Gibbons are completely fabricated by Kelly and Kenneth [O.] and they are in fact all lies.

In his answer to the informal complaint, the respondent implicitly denied the existence of a sexual relationship between him and Kelly O. as a factual basis for the informal complaint.

The Grievance Committee concluded, and we agree, that the submission of Mary W.'s affidavit, together with the implicit denials of any sexual relationship between the respondent and Kelly O. made in his answer to the informal complaint, constitute false and misleading information and that his conduct is contrary to DR1–102(A)(2)–(6).

## VII.

### Discipline

The three instances of misconduct, standing separately, would be punishable by a censure or suspension, at a minimum. However, the combination of the respondent's multiple violations of the Code, when considered in light of his previous suspension (*see supra* note 1), leads us to conclude that disbarment is required. The offenses committed by the respondent are contrary to the high standards of honesty, justice, and morality expected of lawyers. *See People v. Pacheco*, 198 Colo. 455, 608 P.2d 333 (1979); *People v. Radinsky*, 176 Colo. 357, 490 P.2d 951 (1971). Accordingly, the respondent, John J. Gibbons, is disbarred as a member of this court. He is further ordered to pay the costs of this proceeding in the amount of $990.70 within sixty (60) days from the date of this order.

ERICKSON, C.J., does not participate.

---

**6.** *See generally* Annot., 36 A.L.R.3d 735 (1971), for a discussion of whether and under what circumstances sexual misconduct by an attorney constitutes grounds for disciplinary action.