The **PEOPLE** of the State of Colorado, Complainant,

v.

Levi **MARTINEZ,** Attorney-Respondent.

No. 86SA231.

Supreme Court of Colorado, En Banc.

July 13, 1987.

As Modified on Denial of Rehearing Aug. 24, 1987.

---

Linda Donnelly, Disciplinary Prosecutor, George S. Meyer, Deputy Disciplinary Prosecutor, Denver, for complainant.

Dolores Martinez Hernandez, Pueblo, for attorney-respondent.

LOHR, Justice.

In this disciplinary proceeding, a hearing panel of the Supreme Court Grievance Committee recommended that respondent Levi Martinez be disbarred. The panel also recommended that Martinez be ordered to pay the costs of the proceedings and to make restitution to Hannah Bohlmann and David A. McKillop in the amounts of $22,-525 plus statutory interest, and $25,000 plus statutory interest, respectively.[1] The recommendation was based on various incidents of professional misconduct, including conflicts of interest, neglect, and misrepresentation, relating to two of the respondent's clients in violation of DR 1-102(A)(4), DR 5-104(A), DR 5-105(B), DR 6-101(A)(3), and DR 9-102(B)(3) and (4) of the Code of Professional Responsibility, and Rule 241.6(4) of the Colorado Rules of Civil Procedure. We agree that disbarment is the appropriate remedy for the respondent's professional misconduct and direct that he be disbarred and that he be ordered to pay the costs of these proceedings.

I.

The respondent, Levi Martinez, was admitted to the bar of the Supreme Court of the State of Colorado in 1951 and practiced law almost continuously from the time of his admission until January of 1973. Between 1973 and March of 1982, the respondent worked primarily on the acquisition of water rights and on entrepreneurial ventures involving alternative energy sources. In 1982, he returned his attention to the practice of law, representing ten or fewer clients per year. The respondent testified that he owes taxes for unspecified years between 1975 and 1983. He also testified that several money judgments that were yet unsatisfied had been filed against him in amounts exceeding $300,000.

II.

The matters from which this disciplinary action originated involved the respondent's dealings with two of his clients, Hannah Bohlmann and David McKillop. We summarize the relevant facts.

A. *Hannah Bohlmann*

1. *Insurance Matters*

Bohlmann and Martinez became social acquaintances in the summer of 1980. Bohlmann immigrated from Germany in 1954 and is now approximately 63 years old. In February of 1984, Bohlmann was involved in an automobile collision for

---

**1.** The hearing board before which this matter was tried recommended that any petition of Martinez for readmission to the bar must contain proof that he has made restitution to Bohlmann and McKillop in these amounts. The hearing board did not recommend that the respondent be ordered by this court to make the restitutionary payments. It is not entirely clear from the hearing panel's order whether the panel intended to adopt a recommendation different from that of the hearing board or whether the variance between the two recommendations was inadvertent. We elect to adopt the form of relief recommended by the hearing board.

which she received a traffic citation. Claims were made against her by the owners and operator of the other vehicle. Upon notifying her insurance carrier of the accident, she was informed that her insurance had been canceled as of December 31, 1983, because she had failed to sign and return certain forms.

In early March of 1984, Bohlmann contacted Martinez to elicit his aid in dealing with the problems arising from the automobile accident. He met with Bohlmann at her house to discuss the matters and agreed to represent her in attempting to secure coverage from her insurance company and in pursuing any claims she might have for the wrongful cancellation of her automobile policy. The respondent told Bohlmann that in representing her in the dispute with the insurance company his fee would be $1,000, half of which was to be paid in advance, together with $80 for court costs. Martinez also apparently agreed to represent Bohlmann concerning the traffic ticket, but a fee for those services was not discussed. Bohlmann paid Martinez a retainer fee of $580, and gave him the traffic citation and the various insurance papers that were in her possession. Thereafter, all the mail that Bohlmann received in relation to the accident was forwarded by her to the respondent's office in Colorado Springs at his request.

Martinez was successful in obtaining dismissal of the traffic case. He advised Bohlmann early in June that he had gone to court on her behalf and when the police officer who had issued the ticket failed to appear, the case was dismissed.

In August of 1984, after Martinez had made no significant progress concerning the insurance coverage matter, and after other problems had arisen between Bohlmann and Martinez, Bohlmann retained another lawyer. That lawyer attempted on several occasions to retrieve Bohlmann's auto insurance file from Martinez, without success. Although Martinez had lost the file, he never advised Bohlmann or her new attorney of that fact. There is no evidence in the record that any of the claims against Bohlmann related to the accident were ever pursued. No progress was ever made on her claim against the insurance company. No part of the retainer fee paid by Bohlmann to Martinez was returned to her, and Martinez never furnished Bohlmann with an accounting for his services in this matter. The hearing board concluded that Martinez's conduct in the Bohlmann insurance matter was neglectful and that he acted improperly in retaining the fee without accounting to Bohlmann for his services.

### 2. Loan Matters

In September of 1983, Martinez established Money Finders, Inc., a loan brokerage business. The business ceased operations in October of 1984, and made only one loan during its entire existence—a loan utilizing funds obtained from Bohlmann.

In mid-June of 1984, three and one-half months after Bohlmann retained Martinez on the insurance matter, she received copies of documents reflecting the dissolution of her marriage. Concerned about the dissolution, and apparently not having been represented by counsel in the proceedings, Bohlmann called Martinez, and he went to her home to review the papers. He also reviewed her will. Approximately one week later, Martinez contacted Bohlmann and asked if he could borrow some money from her so that Money Finders, Inc. could make a loan to a prospective customer. At the time, Bohlmann's total assets consisted of approximately $20,000 in certificates of deposit in addition to her residence, which she owned free and clear of encumbrances. She refused the request for a loan.

Later in June, Martinez called Bohlmann to invite her to ride along with him on a brief business trip to Greeley. She accepted the invitation. During the course of the day, the subject of a loan was discussed again. Martinez said that a friend of his, Mark Patterson, needed $20,000 to pay his employees. Patterson was a plumbing contractor and although he currently was without adequate cash, he supposedly was to receive over $31,000 for work on a plumbing contract sometime around July 6th. The payment was to be in the form of

a joint payee check payable to Patterson and his supplier and was to be in an amount more than $31,000 in excess of the amount owed by Patterson to the supplier. Martinez told Bohlmann that if she loaned the money to Patterson through Money Finders, Inc., she would be repaid in full in two weeks and would receive an additional $2,000. Based on Martinez's promise of returning her money, and her trust in him as an attorney, she agreed to make the loan.

Martinez never discussed the possibility of a conflict of interest arising between them, nor did he encourage her to obtain the advice of independent counsel with respect to the loan. He did not provide her any information about the financial condition of Money Finders, Inc. or his own financial condition, which rendered his personal guarantee worthless, nor did he tell her that three banks had declined to make such a loan to Patterson.

The next morning, June 29th, Martinez and Patterson went to Bohlmann's home and waited there while she traveled to the bank to obtain a loan. Using her certificates of deposit as collateral, she signed a promissory note for $21,825 and received a cashier's check in the amount of $20,000[2] made payable to the order of Martinez. Patterson executed a note in the amount of $22,000 payable on July 6, 1984, to Money Finders, Inc. Martinez, as president of Money Finders, Inc., assigned the note to Bohlmann and also guaranteed payment of the note individually. In addition, Patterson signed a statement on June 29th agreeing to pay the interest that Bohlmann would incur on the $20,000 she had borrowed. In order to show Bohlmann how the loan would be repaid, Martinez provided her with a summary of the prospective payments to be received by Patterson on the plumbing contract, the amounts to be used to pay the supplier, and the balance remaining for use in paying the loan made with Bohlmann's funds. Martinez and Patterson signed a letter to the supplier directing the supplier, upon receipt of the check

in payment for Patterson's work on the plumbing contract, to issue its check for the balance of the monies due Patterson after deducting the amount of Patterson's account with the supplier.

Martinez and Patterson returned to Colorado Springs with the $20,000, deposited $2,000 into Martinez's bank account, obtained four cashier's checks totaling $9,800 made payable to companies controlled by Patterson, paid a $12 fee for the cashier's checks, and took the remainder of the money in cash, $7,688 for Patterson—ostensibly to be used to meet Patterson's payroll—and $500 for Martinez.

Patterson eventually did receive payment from his supplier, but the payment was in the amount of $12,555 rather than the $31,000 he had said was owed to him. It can be inferred that after receiving Bohlmann's money, Patterson continued to order supplies from his supplier, thereby increasing the balance of his account and decreasing the amount of the proceeds to be received by Patterson from the plumbing contract payment. The check he received was made payable to both Money Finders, Inc. and Patterson's business. Patterson forged an endorsement for Money Finders, Inc. and absconded with the $12,555.

Subsequent to July 6, 1984, Bohlmann made several calls to Martinez in an effort to recover her money. On one of the rare occasions that she was able to reach Martinez, he advised her that if she could wait, she would be paid an extra $1,000. Bohlmann eventually retained another attorney to help her recover her money from Martinez, as well as to pursue her claim against the insurance company. Bohlmann terminated the services of the other lawyer on August 29, 1984, because she could no longer afford to pay him.

In September of 1984, Martinez took Bohlmann to a meeting with an attorney who represented the bank that had paid the $12,555 check bearing the forged endorsement. Nothing came of the meeting, and

**2.** The difference between $21,825 and $20,000 apparently represented the interest cost to Bohlmann on the bank loan.

no claim against the bank was ever made on Bohlmann's behalf. In October, Martinez issued two $1,000 checks to Bohlmann from the Money Finders, Inc. account, both of which were ultimately dishonored. Thereafter, Martinez provided a cashier's check in the amount of $1,350 to Bohlmann, which was the full extent of his reimbursement to her.

Bohlmann retained an attorney on a contingent fee basis in January of 1985 and filed a complaint against Martinez seeking recovery of the moneys she had loaned. No answer was filed, and as a result, Bohlmann obtained entry of a clerk's default against Martinez on or about October 25, 1985. The record does not reflect that any further action has been taken concerning this litigation.

The hearing board concluded that Martinez encouraged Bohlmann to enter into a business transaction with him in which the two had differing interests, that Martinez failed to disclose relevant facts and that Bohlmann clearly and reasonably expected Martinez to exercise his professional judgment for her protection, and that he failed her. The hearing board concluded that Martinez grossly neglected Bohlmann's interests in this matter.

## B. David McKillop

Martinez began providing legal services to Donald Lopez in September of 1983, for which he received $500 a week. Martinez continued to provide such services until January or February of 1984.

On December 6, 1983, David McKillop was served with a complaint filed by Irvin Freeman and his business, Supra Fund. The complaint alleged that McKillop and his son-in-law, Donald Lopez, had conspired to defraud Freeman through a transaction involving the purchase of land. McKillop's involvement in the suit stemmed solely from the appearance of his signature on some documents pertaining to the allegedly fraudulent real estate transaction. McKillop testified in the grievance proceeding that his signature had been forged on those documents by Lopez. Upon receipt of the complaint, McKillop contacted Lopez. At Lopez's suggestion, McKillop engaged Martinez to represent him in the dispute. Martinez also represented Lopez, who was a defendant in that same litigation.

On or about December 16, 1983, Lopez told McKillop that the lawsuit could be settled for $600,000 if McKillop would provide the last $25,000. McKillop testified that he informed Martinez in a telephone conversation that he would wire the $25,000 to Martinez for use only in a settlement that would result in the complete release of McKillop from liability in the Supra Fund case. Martinez testified that the only instructions he received from McKillop were that the monies were to be used only for settlement purposes, and that Martinez was to obtain a promissory note from Lopez in the amount of $25,000. Subsequent to the telephone conversation, McKillop wired $25,000 to Martinez.

Upon receipt of the $25,000 by Martinez, Lopez immediately informed Martinez that he and a business associate needed money to go to Texas and arrange for the rest of the funds required to settle the case. Martinez opened a trust account with the $25,000 on December 19th; only $4,000 remained in the account by the close of business that day. Martinez used $10,000 to obtain a cashier's check payable to Lopez, and $11,000 to purchase a cashier's check payable to Edward Vigil, an associate of Lopez. On December 21st, Martinez withdrew $500 for himself, and on December 22nd, at Lopez's direction, Martinez wrote a check for $2,000 payable to the mortgagee of Lopez's house.

McKillop sent a letter to Martinez, dated December 16, 1983, after their telephone conversation, confirming his intent that the $25,000 be used to settle the lawsuit instituted by Freeman, and that a full release be obtained from Freeman on McKillop's behalf. When Martinez received the letter, he did not advise McKillop that most of the money had already been disbursed. The hearing board concluded that there was no clear and convincing evidence of the nature of the oral trust agreement between McKillop and Martinez prior to the latter's receipt of the December 16 letter, but that

thereafter almost all of Martinez's expenditure of monies from the account were dishonest. The board characterized the payments before receipt of the letter as neglectful.

On January 5, 1984, McKillop requested the return of the $25,000 unless the lawsuit was settled, and in the latter part of February he retained separate counsel to help him recover his money. In turning over the file, Martinez did not tell new counsel of outstanding overdue discovery requests and such requests did not appear in the file. The hearing board concluded that this conduct was neglectful.

McKillop did not learn that the money had already been disbursed until Lopez informed him of that fact on the 3rd of March. All McKillop's efforts to obtain repayment were unsuccessful. Martinez continued to write checks against the account through the end of March. Only one of these checks, in the amount of $20, was relevant to McKillop's interest in the Supra Fund suit. On May 31, 1984, the bank closed the trust account because it was overdrawn.

McKillop was eventually dismissed from the Supra Fund lawsuit when it was established that Lopez had forged his signature on the documents that provided the basis for the claim against him. McKillop never recovered any of the $25,000 advanced to Martinez.

The hearing board concluded that at least as early as the receipt of the December 16 letter, Martinez became aware that representation of both Lopez and McKillop in the litigation involved a conflict of interests. It also concluded that Martinez allowed his economic relationship with Lopez to influence his judgment in representing McKillop, thereby adversely affecting McKillop's important interests.

### III.

■ The hearing board concluded that the testimony established by clear and convincing evidence that the respondent had violated DR 1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation) as to both Bohlmann and McKillop;

DR 5–104(A) (limiting the circumstances in which a lawyer may engage in business relations with a client) as to Bohlmann; DR 5–105(B) (employment by different clients with adverse interests) as to McKillop; DR 6–101(A)(3) (neglect of a legal matter) and C.R.C.P. 241.6(4) (commission of gross negligence by a lawyer) as to both Bohlmann and McKillop; DR 9–102(B)(3) (failure to maintain complete records and render appropriate accounts) as to Bohlmann; and DR 9–102(B)(4) (failure to pay or deliver promptly to a client funds or other properties in the lawyer's possession that the client is entitled to receive) as to both Bohlmann and McKillop. We agree. The mere recital of the events that led up to the charges is sufficient to demonstrate that the hearing board's conclusions are solidly grounded in facts establishing the various types of professional misconduct specified in the hearing board's conclusions.

■ Several exceptions to the hearing board's findings of fact and recommendations were raised by the respondent. The respondent also excepted to the hearing board's denial of his motion for continuance to enable him to obtain counsel to represent him at the grievance committee hearing. In support of his motion for continuance, Martinez claimed that he lacked sufficient funds to hire an attorney and that he wished to have his daughter, a licensed attorney, represent him, but that she was unavailable on the hearing date that had been scheduled. The hearing board denied the respondent's motion for continuance.

The events surrounding the motion for continuance and its denial are set forth in the People's answer brief before this court and are not controverted by the respondent. A notice of hearing was sent to all parties on January 2, 1986, specifying the April 15, 1986, hearing date. The respondent's motion for continuance was first presented on April 9, 1986, three business days before the hearing was to commence. At that time, Dolores Martinez, the respondent's daughter, made an oral motion and argued it by telephone in a conference call with the attorney for the People and the

presiding officer of the hearing board. The presiding officer denied the motion on the basis that it was presented too near the trial date and explained further that, with six attorneys' calendars to coordinate for a hearing date, any continuance would be lengthy. Respondent filed a written motion to vacate one day before the hearing and that motion also was denied on the day of the hearing.

We have ruled with respect to both civil and criminal proceedings that the granting or denying of a motion for continuance lies within the sound discretion of the trial court. *Miller v. People*, 178 Colo. 397, 398–99, 497 P.2d 992, 993 (1972); *Johnson v. People*, 172 Colo. 72, 80, 470 P.2d 37, 42 (1970). In determining whether the trial court has abused its discretion, "the total circumstances, as reflected by the record, must be taken into consideration." *Miller v. People*, 178 Colo. at 400, 497 P.2d at 993. Applying the same standard of review to this disciplinary proceeding, we find no abuse of discretion. Considering the fact that the respondent had received notice of the upcoming hearing date three months in advance and that he waited to move for continuance until there were only three business days before the hearing, the record supports the presiding officer's decision to deny the respondent's motion.

■ The respondent further excepts to several factual findings of the hearing board and argues that the recommendation of disbarment is excessive. When reviewing such factual findings, we have held that "the factual findings of the Grievance Committee are binding upon this court unless, after considering the record as a whole, we conclude that they are clearly erroneous and unsupported by substantial evidence." *People v. Gibbons*, 685 P.2d 168, 173 (Colo.1984). Upon review of this record, we find ample evidence to support the hearing board's factual findings. We also agree with its recommendation of disbarment.

Section 4.31(a) of the *ABA Standards for Imposing Lawyer Sanctions* (1986) recommends disbarment when the lawyer engages in representation of a client knowing that the lawyer's interests are adverse to those of the client "with the intent to benefit the lawyer or another, and causes serious or potentially serious injury to the client[.]" Section 4.11 of the *ABA Standards* provides that disbarment is generally appropriate when a lawyer knowingly converts client property and causes injury to a client. Although the hearing board did not conclude that Martinez's actions were done with the intent to injure his clients, and he was not the substantial beneficiary of either client's loss, he certainly did nothing to protect them. Moreover, he did reap some financial benefit from each of the transactions at issue here, even though most of the misused funds were received by others.

Respondent Martinez's misuse of clients' funds entrusted to him "strikes at the heart of the legal profession by destroying public confidence in lawyers." *People v. Buckles*, 673 P.2d 1008, 1012 (Colo.1984). The public has a right to expect that such professional misconduct will be severely disciplined. *See People v. Kendrick*, 646 P.2d 337, 340 (Colo.1982).

Both the Colorado Rules of Civil Procedure and the *ABA Standards* instruct the hearing board to consider an attorney's prior disciplinary record when determining the sanctions to be imposed. *See* C.R.C.P. 241.15(a), 7A C.R.S. (1986 Supp.); § 9.0 *ABA Standards for Imposing Lawyer Sanctions* (1986). *See also People v. Young*, 673 P.2d 1003, 1005 (Colo.1984) (respondent's actions, coupled with past disciplinary record, reflected a continued pattern of conduct involving neglect and misrepresentation and warranted disbarment). The respondent has received discipline on several prior occasions.

In March of 1975, the respondent received a letter of admonition as a result of his neglect and delay in filing a criminal appeal and his actions in permitting title to real property that he held as trustee to become clouded by judgment liens based on his personal obligations. These title clouds prevented a sale of the property. In September of 1977, an inquiry panel of the grievance committee dismissed a complaint filed against Martinez, but admonished him for his failure to respond to and cooperate with the committee in the grievance pro-

ceeding. In February of 1983, the respondent was privately censured for his involvement with a client in a loan transaction wherein Martinez's default caused foreclosure proceedings to be initiated on his client's home. Finally, in November of 1985, Martinez again was admonished for failing to respond to and cooperate with the grievance committee. The number of ethical violations committed by this respondent with respect to his clients Bohlmann and McKillop, considered together with his prior disciplinary record, fully support the grievance committee's recommendation of disbarment.

Accordingly, it is ordered that the respondent, Levi Martinez, be disbarred and his name be stricken from the roll of lawyers authorized to practice before this court. The respondent is ordered to pay the costs of this proceeding in the amount of $1,400.51 to the Supreme Court Grievance Committee, 190 East 9th Avenue, Suite 440, Denver, Colorado, 80203, within six months from the date of the announcement of this opinion. The respondent is directed to comply with the requirements of C.R.C.P. 241.21, specifying certain action to be taken after disbarment. It is further ordered that the respondent shall not be readmitted to the bar of this state until he shall have made restitution to Hannah Bohlmann in the amount of $21,175 [3] plus interest at the statutory rate from June 29, 1983, the date of the Bohlmann loan, and to David McKillop in the amount of $25,000 plus interest at the statutory rate from December 19, 1984, the date of the first improper distributions of McKillop's funds from the respondent's trust account. The respondent's readmission is further conditioned upon full compliance with C.R.C.P. 241.22(a) and proof of payment of costs.

3. The hearing board computed this amount as $22,525, representing $21,825 borrowed by Bohlmann to make the $20,000 loan, $420 paid as attorneys fees, and $280 from the retainer in the insurance case. The hearing board did not explain why the respondent was not credited with the $1,350 he repaid to Bohlmann. Although the respondent did not except to the calculation, we believe it just to allow the credit and therefore determine the amount of restitution to be made to Bohlmann as $21,175 plus interest.