The **PEOPLE** of the State of Colorado, Complainant,

v.

Gary Alan **BOTTINELLI,** Attorney–Respondent.

No. 88SA353.

Supreme Court of Colorado, En Banc.

Oct. 30, 1989.

---

Linda Donnelly, Disciplinary Counsel, and Susan L. Fralick, Asst. Disciplinary Counsel, Denver, for complainant.

Berger & Berger, David Berger, Commerce City, for attorney-respondent.

Justice KIRSHBAUM delivered the Opinion of the Court.

A disciplinary complaint was filed with the Grievance Committee charging the respondent, Gary Alan Bottinelli, with numerous counts of unprofessional conduct in connection with his representation of himself and two business entities in two civil actions. A hearing panel unanimously approved the hearing board's findings of fact and recommendations that respondent be suspended from the practice of law for a period of three months and be assessed the costs of these proceedings. We conclude that under the circumstances suspension from the practice of law for a period of six months is a more appropriate sanction.

I

The respondent was admitted to the bar of this court on April 26, 1972, and is subject to the jurisdiction of this court and the Committee. C.R.C.P. 241.1(b). The respondent contests the jurisdiction of the Committee to conduct inquiry into his alleged professional misconduct while the two lawsuits in question were pending. The alleged misconduct arose in the context of ongoing litigation, and respondent contends that the Committee's investigation had a chilling effect on his participation in the lawsuits, both as a party and as the attorney representing himself and other entities.

We reject the argument that the Committee may not consider allegations of

professional misconduct during the pendency of a lawsuit giving rise to the subject matter of the grievance proceeding. All attorneys licensed to practice law in Colorado are subject at all times to the jurisdiction of the Supreme Court in matters relating to the practice of law. C.R.C.P. 241.-1(b). While trial courts have authority to rule on questions of law and fact as they arise in the course of trial, including the authority to rule on matters that are also relevant to issues raised during the course of disciplinary proceedings, that fact does not restrict the ability of the disciplinary counsel to conduct investigations into alleged misconduct or disability of attorneys. *See Royal Indem. Co. v. J.C. Penney Co., Inc.,* 27 Ohio St.3d 31, 501 N.E.2d 617 (1986). While deferment of disciplinary action until the conclusion of pending litigation may be appropriate in some cases, the Committee and its disciplinary counsel has discretion to make such determination.

■ Respondent also asserts that the Committee improperly exercised its discretion to proceed with the grievance process while the civil litigation was pending. We disagree. Under the circumstances revealed by the record, including the fact that one of the lawsuits was initiated by respondent subsequent to the institution of grievance proceedings against him, the Committee was fully justified in carrying out its responsibilities while the litigation giving rise to the complaint progressed.

## II

In 1984, the respondent formed a barter exchange organization, Exchange Network Corporation. Ray Joy and J. Gunson joined the business and respondent hired Linda Wilmore to perform secretarial work for Exchange Network.

In February of 1985, Wilmore issued a $200 check from Exchange Network to Steve Vignali, a commissioned salesman for the company, in contravention of respondent's specific instructions. Respondent,

who believed Wilmore issued the check because of her personal relationship with Vignali, accused Wilmore of being a thief. Wilmore promptly ceased working for Exchange Network.

Joy and Gunson later severed their ties with Exchange Network due to deteriorating business relationships with respondent. On June 14, 1985, Joy, Gunson, and Wilmore filed a seven-claim civil action in the Jefferson County District Court, civil action No. 85CV1812, against respondent, Exchange Network and Xnet Corporation, another business entity owned by respondent. All three plaintiffs were represented by attorney Allan Lenefsky. Joy and Gunson sought compensatory damages of $37,250 and exemplary damages of $352,500 on grounds of fraud, payments owed for trade credits and breach of contract. Wilmore sought $3,000 in compensatory damages and $30,000 exemplary damages for defamation.

On October 8, 1985, respondent, on behalf of himself as pro se defendant, served a set of interrogatories and a request for production of documents on Wilmore. Several of the interrogatories sought information about Wilmore's attendance at church functions; her social and religious activities while a college student; names, addresses and telephone numbers of her neighbors, friends and persons who attended her wedding; and the number of times she had lunch with or engaged in telephone conversations with Ray Joy while she was an Exchange Network employee.

On December 10, 1985, respondent, representing all defendants, sent a second set of interrogatories and request for production to Wilmore, together with a request for admissions and an affidavit of Brian Dale Burt. The interrogatories contained additional requests for information concerning Wilmore's personal and religious activities, including her relationships with men other than her husband.[1]

---

1. For example, some of the interrogatories asked when Wilmore had last seen Vignali, how often she had car-pooled to work with Vignali, whether she had wrestled and rolled with Vig-

nali or some other person on her front lawn during the spring or summer of 1985, whether she knew that a neighbor had informed an investigator hired by respondent that Wilmore

Wilmore filed objections to these discovery requests, and on January 10, 1986, the trial court issued an order sustaining the objections to questions regarding Wilmore's religious beliefs, the social organizations to which she belonged, her sexual practices and her reputation. The trial court stated:

The rules of discovery are to be applied liberally, but are not to be used in an oppressive manner. Discovery should lead to discoverable material.... The court finds that it is hard-pressed to see the relevance of plaintiff's sexual reputation. It is not probative ... of whether ... Wilmore was slandered when she was referred to as a thief.

. . . .

The questions regarding her husband's employment, her religious beliefs, including Bible meetings, social organizations she belongs to and her sexual practices and reputation are not discoverable.

. . . .

Questions to [Wilmore] regarding her date of birth, parents, social, religious organizations, neighbors and education are too broad and not discoverable....

On January 9, 1986, Lenefsky withdrew as attorney for plaintiffs and Samuel Escamilla entered his appearance. Lenefsky took this step because of mounting frustration and anger at what he perceived to be overly aggressive litigation tactics employed by respondent. He at no time suggested that he agreed with respondent's expressed view that Lenefsky's representation of all three plaintiffs constituted a conflict of interest.

On January 15, 1986, respondent filed a motion to disqualify Escamilla on the ground of conflict of interest and requested appointment of separate counsel to represent Wilmore. That motion contained the following statement: "The original attorney for plaintiffs in this action withdrew as their counsel for an obvious conflict of interest between the plaintiffs." On March 17, 1986, the trial court denied the motion.

On January 18, 1986, respondent sent a letter to the Committee indicating interest in filing grievances against Escamilla and Lenefsky. The letter stated that Lenefsky had withdrawn as counsel for the plaintiffs in the pending civil action because of a conflict of interest and that Escamilla had assumed representation of the plaintiffs with knowledge of this conflict of interest.

On March 12, 1986, the trial court ordered a separate trial of Wilmore's defamation claim. The trial court also noted that both sides were being extremely uncooperative with regard to discovery matters and warned respondent and Escamilla to stop such conduct.

On March 21, 1986, respondent and Escamilla conducted a deposition of Burt in a conference room at respondent's office. At the same time, Joy, Gunson, an accountant they had employed and an employee of respondent were in another room copying documents of respondent in connection with plaintiffs' discovery requests. Joy and Gunson left the document area and joined respondent, Escamilla, Burt and an investigator employed by respondent.

Shortly thereafter respondent's employee entered the conference room and spoke to respondent. Respondent left the room, re-

---

was a "slut" and a "whore," and whether she realized that by filing a claim alleging slander she had placed her reputation in issue. In addition, the Burt affidavit, dated July 30, 1985, contained the following averments:

(A) "I heard Steve Vignali tell me that he thought [Wilmore] was 'gorgeous' and he said that she 'was one of the most beautiful girls I've ever seen.' "

(B) "[D]uring and after [Wilmore's] employment with Exchange Network, I noticed that [Wilmore] and Steve were very attached to each other and that, in fact, they were very seldom apart."

(C) "That [Wilmore] seemed to me to be promiscuous and at least twice, when I was sitting down, she would come up behind me and rub my back."

(D) "That it was apparent from the way [Wilmore] talked and acted around Ray Joy that she was very fond of him."

(E) "That, from my familiarity with this situation and examination of the records of Exchange Network, I have concluded that there is no doubt that [Wilmore] stole from Exchange Network."

turned and accused Joy and Gunson of having removed documents without respondent's permission. Joy and Gunson denied the accusation. Respondent then accused Escamilla of hiding the documents, attempted to seize Escamilla's briefcase and, when met with resistance, pushed Escamilla. During the ensuing struggle, Escamilla's shirt was torn and he was thrown to the floor. Although Joy and the investigator also participated in the struggle, respondent acknowledged that he initiated the fracas by attempting to seize the briefcase.

On March 24, 1986, respondent sent a letter to Escamilla berating Escamilla for refusing to negotiate Wilmore's claim "alone," accusing Escamilla of failing to adequately advise or represent Wilmore, and stating that "it is distressing to observe your callous disregard of [Wilmore's] plight of being involved in a legal action in which she cannot possibly win, and in which she is being sacrificed by her attorney for the benefit of his other two clients." Respondent sent a copy of this letter to Wilmore without first obtaining Escamilla's consent.

In March of 1986, Wilmore, Joy and Escamilla filed separate requests for investigation with the Committee. On April 7, 1986, an investigative counsel sent a letter to respondent advising him of Joy's request for investigation and expressly referring to the confidentiality provisions of C.R.C.P. 241.24(b). On May 2, 1986, respondent filed a motion to amend a counterclaim in the pending civil action, which motion stated that "Ray Joy filed a false grievance with the Colorado Supreme Court Grievance Committee against Gary Bottinelli."

On April 8, 1986, respondent filed a motion for entry of summary judgment against Wilmore on her defamation claim. Attached to the motion was the July 1985 affidavit of Burt as well as an affidavit executed by Jack Trostle. The Trostle affidavit contained allegations that Joy was unfaithful to his wife and that Joy's daughter had a "promiscuous reputation."

Wilmore died in an auto-pedestrian accident in early April 1986. On May 5, 1986, the court entered an order dismissing her claim.

On October 16, 1986, respondent failed to appear at a motions hearing previously set for that date. The trial court ordered respondent's motions stricken, awarded attorney fees to the plaintiffs, and subsequently ordered respondent to pay $150 in attorney fees. When respondent failed to pay the sum within the prescribed time, the trial court issued a contempt citation against respondent.

On January 15, 1987, respondent filed a separate civil action in the Jefferson County District Court, civil action No. 87CV185, against Lenefsky and Escamilla. The complaint alleged that Lenefsky and Escamilla had engaged in outrageous conduct and that both defendants knowingly represented Wilmore in spite of a conflict of interest. The specified acts of outrageous conduct included the following: "Escamilla assaulting Gary A. Bottinelli in concert with Ray Joy," and "Escamilla acting in concert with his clients to steal documents from [respondent]." On January 20, 1987, respondent sent a letter to Escamilla stating that respondent intended to call Escamilla and Lenefsky as witnesses at the trial of the claims of Joy and Gunson. The letter contained statements to the effect that Escamilla had not represented Wilmore's interests at all, but instead had used her as a "scapegoat" to achieve favorable settlements of the claims of Joy and Gunson.

On April 23, 1987, a hearing was held on the contempt citation previously issued against respondent. After the hearing respondent initiated a fight with Joy in the courtroom. Both respondent and Joy were arrested. On July 8, 1987, the trial court held respondent in contempt of court for having initiated the April 23 altercation.

### III

■ The Committee concluded that the respondent's conduct violated the following disciplinary rules contained in the Code of Professional Responsibility (the Code): DR1–102(A)(4) (conduct involving misrepresentation); DR1–102(A)(5) (conduct preju-

dicial to the administration of justice); DR1–102(A)(6) (conduct adversely reflecting on a lawyer's fitness to practice law); DR7–102(A)(1) (conduct which a lawyer knows or which obviously would lead to harassment of another); DR7–104(A)(1) (communicating with an adverse party without permission of the party's attorney). The Committee also concluded that respondent's conduct violated C.R.C.P. 241.24, respecting the confidentiality of grievance proceedings.

Respondent admits that certain of his actions violated provisions of the Code. C.R.C.P. 241.24 prohibits disclosure of pending grievance proceedings in the absence of an order by the Committee granting such disclosure. Respondent's reference in his amended counterclaim to the fact that Joy had initiated a grievance proceeding against respondent clearly violated that rule. DR7–104(A)(1) prohibits communication by an attorney with an adverse party in the absence of prior consent to such communication from the party's attorney. Respondent's direct communication with Wilmore violated that rule. Respondent asserts that he was justified in communicating directly with Wilmore because Escamilla refused respondent's offers to negotiate her defamation claim separately from the claims of Joy and Gunson. Respondent believed that Wilmore was being manipulated by Joy and Gunson to achieve a favorable settlement of their claims, and also believed that Escamilla approved such tactic, to Wilmore's detriment. Whatever the merits of respondent's beliefs, the communication of his views to Wilmore without first obtaining permission to do so from her attorney was impermissible. Furthermore, the record supports the Committee's conclusion that respondent's communication with Wilmore was designed to harass and intimidate her and to shake her confidence in the abilities and motives of her attorney.

DR1–102(A)(4) prohibits conduct "involving dishonesty, fraud, deceit, or misrepresentation." Respondent's representations in a pleading and in a letter to the Committee that Lenefsky had withdrawn as attorney for the plaintiffs because of an admitted conflict of interest was false. At a later date the trial court concluded that representation of the three plaintiffs by Escamilla did not constitute a conflict of interest. Respondent's belief that a conflict of interest did exist cannot justify a decision to mislead the trial court and the Committee with regard to Lenefsky's view on this issue.

Respondent again misrepresented facts in a pleading by affirmatively alleging that Escamilla, in concert with Joy, had assaulted respondent and had stolen documents from respondent. Respondent knew such allegations were not true, and the record supports the hearing board's conclusion that these allegations were designed to harass Escamilla.

Respondent argues that the record does not support the hearing board's conclusion that he violated DR7–102(A)(1), which rule states as follows:

In his representation of a client, a lawyer shall not: (1) File a suit, assert a position, conduct a defense, delay a trial, or take other action on behalf of his client when he knows or when it is obvious that such action would serve merely to harass or maliciously injure another.

Respondent contends that his repeated efforts to acquire information about Wilmore's sexual conduct, religious habits and personal acquaintances were occasioned by his belief that by accusing him of slander she had placed her reputation in issue. Respondent apparently based this erroneous proposition on his interpretation of statements in a manual containing litigation forms. However, on April 8, 1986—long after the trial court had ruled that Wilmore's religious, social and sexual practices were not relevant to the action—respondent filed the 1985 affidavit of Burt discussing Wilmore's personal relationships together with another affidavit alluding to promiscuous conduct by Joy. Other matters of record also support the hearing board's conclusion that the tenor, tone and frequency of respondent's written and verbal communications were calculated to harass adverse parties and their attorneys. While extreme antagonism and bitterness among the parties and all attorneys

marked the progress of these cases, such hostile atmosphere cannot justify respondent's flagrant and repeated violations of the Code.

Respondent repeatedly argues that Joy and Gunson did in fact manipulate, influence and "use" Wilmore to obtain an unfair advantage in their dispute against him and that Escamilla's improper refusal to negotiate separately Wilmore's claim forced respondent to engage in over-zealous conduct. However disturbing the factors precipitating respondent's conduct might have appeared to him, the record amply supports the unanimous conclusion of the hearing board that his conduct was designed to harass Wilmore, Joy, Gunson and the two attorneys who represented them. *See People v. Barnthouse*, 775 P.2d 545 (Colo. 1989). It is the board's prerogative to assess the credibility of witnesses and to resolve any conflicts in the evidence. *People v. Blanck*, 700 P.2d 560 (Colo.1985). When the record contains ample evidence to support the Committee's findings and conclusions, this court will not overturn such findings and conclusions. *People v. Gibbons*, 685 P.2d 168 (Colo.1984).

The record also supports the conclusion that respondent violated DR1–102(A)(5), prohibiting conduct prejudicial to the administration of justice, and 'DR1–102(A)(6), prohibiting conduct reflecting adversely on an attorney's fitness to practice law. Respondent's physical altercations with Escamilla and Joy, his persistence in accusing counsel of unprofessional conduct in the face of contrary determinations of a trial judge, his repeated efforts to explore Wilmore's personal life and his misrepresentations to the trial court and to the Committee are but some of the acts considered by the hearing board in reaching its conclusions.

It has been noted that a lawyer who represents himself or herself is a fool twice over. Respondent was unable to separate his volatile emotional reactions to the litigation in which he found himself embroiled from his responsibilities as an attorney to conduct himself in accord with the Code of Professional Responsibility. Respondent's conduct also violated C.R.C.P. 241.6, concerning discipline of attorneys, and DR1–102(A)(1) (violation of a disciplinary rule).

The Committee specifically noted that respondent's refusal to acknowledge the impropriety of his conduct must be deemed an aggravating factor pursuant to section 9.22(g) of the ABA *Standards for Imposing Lawyer Sanctions* (1986) (the *Standards*). Other applicable aggravating factors contained in section 9.22 of the *Standards* are: a pattern of misconduct (§ 9.22(c)), multiple offenses (§ 9.22(d)), vulnerability of the victim (§ 9.22(h)), and substantial experience in the practice of law (§ 9.22(i)). While it is true that respondent's lack of any prior discipline constitutes a mitigating factor pursuant to section 9.32(a) of the *Standards*, the aggravating factors predominate in this proceeding.

Section 7.2 of the *Standards* provides that suspension is an appropriate sanction for conduct "[in] violation of the duty owed to the profession" and "[which] causes injury or potential injury to a client, the public, or the legal system." That standard is applicable here. In balancing the aggravating and mitigating factors disclosed by the record, we conclude that suspension for a period of six months constitutes an appropriate sanction.

Accordingly, pursuant to C.R.C.P. 241.-21(a), respondent, Gary Alan Bottinelli, is suspended from the practice of law for a period of six months, effective thirty days from the date of this opinion. He may not be reinstated until he has paid the costs of these proceedings, in the amount of $1,431.83. Respondent is ordered to pay that sum to the Grievance Committee, 600 —17th Street, Suite 500–S, Denver, Colorado 80202–5435 within sixty days of the date of this opinion.

Justice VOLLACK does not participate.