The PEOPLE of the State of
Colorado, Complainant,

v.

Charles J. HAASE,
Attorney–Respondent.

No. 88SA403.

Supreme Court of Colorado,
En Banc.

Oct. 2, 1989.

Linda Donnelly, Disciplinary Counsel, Denver, for complainant.

Nicholls & Kusic, Jon S. Nicholls, Denver, for respondent.

Justice ROVIRA delivered the Opinion of the Court.

The disciplinary counsel filed a formal complaint with the Colorado Supreme Court Grievance Committee alleging professional misconduct by the respondent, Charles J. Haase. A stipulation of facts entered into between the respondent and the disciplinary counsel, along with the evidence adduced at the hearing, were the basis of the findings and conclusions of the hearing board (Board). The Board recommended that the respondent be suspended from the practice of law for ninety days, but because of the existence of mitigating factors, that forty-five days be stayed, thereby reducing the recommended suspension to forty-five days. It also recommended that respondent be directed to pay the costs of the disciplinary proceeding in the amount of $1,127.79. A hearing panel of the grievance committee concurred in the recommendation and referred the matter to this court. We reject the recommendation because of the serious nature of respondent's misconduct, and, accordingly, order that the respondent be suspended from the practice of law for six months.

I.

The respondent was admitted to the bar of Colorado in 1971, is registered as an attorney upon the records of this court, and is therefore subject to the jurisdiction of this court and its grievance committee with respect to his conduct as an attorney. Respondent is a sole practitioner specializing in personal injury work and has had substantial experience in products liability litigation.

On April 11, 1983, an automobile accident occurred near Pratt, Kansas in which all four occupants in two vehicles were killed. Two of the victims were Shawn Walker's mother, Irene Schneider, and her step-father. Schneider was driving a 1979 Mercury Capri at the time of the accident. It was necessary for paramedics and fire department personnel to cut apart the Capri vehicle to remove the victims. After an on-site investigation by the Kansas State Patrol, the vehicle was taken to Pratt, Kansas for storage in an auto salvage yard. In November 1983, Walker had the Capri moved to her father's farm outside of Tyrone, Oklahoma.

In April 1984, Walker removed the rear wheels and the one undamaged front wheel from the Capri. The two rear tires were

then placed on her pickup truck and driven approximately 1,500 miles.

Walker had been reading newspaper articles concerning a possible defect identified as "rear wheel lock-up" in Ford Motor Company (Ford) vehicles.[1] She wrote to and consulted with certain safety and transportation officials regarding this vehicle defect.

In February 1985, Walker, who had since moved to Colorado Springs, Colorado, contacted the respondent. At that time the Kansas statute of limitations was about to expire.

Respondent immediately contacted Dr. James Smith, an engineer at the University of Wyoming, whom he had used as an expert in other cases. On March 3, 1985, respondent and Smith went to Tyrone, Oklahoma to inspect the Capri automobile. One or two days prior to their visit, Walker replaced the rear tires on the rims and replaced the wheels on the Capri.

During his inspection, Smith noticed that the tires had been used since the accident, and that the rear tires were not on the same side of the vehicle as they were at the time of the accident. Upon inquiry by respondent and Smith, Walker admitted to removing and driving on the tires.

Respondent and Smith concluded that Walker would not have been sophisticated enough to counterfeit the deep skid marks (burn marks) on the tires or fabricate evidence to duplicate or create evidence of "rear wheel lock-up." Smith removed all the tires from the vehicle and took them to his laboratory at the University of Wyoming for further testing.

After Smith's inspection and testing, it was his opinion that the accident was caused by "rear wheel lock-up." On April 10, 1985, respondent filed a lawsuit in the United States District Court for the District of Colorado captioned *John Schmidt, et al. v. Ford Motor Company*, Civil Action No. 85K982, suing Ford on behalf of the estates of all the decedents. The case was assigned to Judge John Kane and an order was entered providing for rapid discovery.

When respondent and Smith first saw the Capri, Smith was upset about the removal of the tires and the fact that the tires had been driven on. He was reluctant to proceed with the case because of what he perceived to be the chain of custody problem with the tires. He also was concerned that the tires had been removed from the rims prior to his inspection and that these problems sufficiently complicated the case so as to render any subsequent opinions as to the causation of the accident highly suspect. He expressed these misgivings to the respondent.

Respondent directed Smith to concern himself with the technical aspects of the case and indicated that he would deal with the evidentiary problems created by Walker's removal and use of the tires. Smith's opinion as to causation of the accident was not affected by the removal and use of the tires. The deep skid marks or "burn marks" were sufficiently pronounced to allow him to conclude that the accident was in fact caused by "rear wheel lock-up" even though the tires had been driven on.

Respondent determined not to disclose the removal and use of the tires to the defendant, taking the position that Ford's expert would discover the fact of the removal and use of the tires. On July 8, 1985, Ford's attorney and its expert, James Schultz, examined the Capri. By the time of this inspection Smith had replaced the tires on the vehicle in the location he believed they were at the time of the accident. Ford was advised that Smith had removed the tires on March 3, 1985, and had them in his possession until he replaced them on the vehicle. Ford was not advised of the removal and use of the tires by Walker at the time of its examination.

Respondent came to the conclusion that Ford had not discovered by its inspection of the Capri, particularly by the tread depth of the tires, the removal or use of the tires

---

**1.** "Rear wheel lock-up" occurs when the rear wheels of a vehicle lock up in a panic stop situation before the front wheels lock up, causing the vehicle to yaw and rotate on its axis, thus losing stability and straight-line stopping ability.

by Walker subsequent to the accident. As a trial litigation strategy, respondent decided not to disclose this information unless a direct question was asked, thereby requiring him to do so. Smith was so instructed by the respondent. In July 1985, respondent received interrogatories from Ford which consisted of seventy-five pages. Interrogatory No. 56 stated:

Please give the dates, circumstances and identity of all parts and components that were ever removed, replaced or added to the Product from the date of manufacture to the date of the answers to these Interrogatories. With respect to such additional parts, please state whether or not those parts and components were manufactured by the defendant.

Respondent advised and assisted Walker, as well as the other plaintiffs, to make the following answer: "See service records available to plaintiffs." This answer was submitted to Ford's counsel in September 1985.

Respondent, in his answer and testimony before the Board, claimed that the removal and use of the tires was not disclosed in response to Interrogatory No. 56, because he misread the interrogatory and assumed it applied to the "alteration of product" defense and dealt only with changes on the vehicle made by the plaintiffs up to the time of the accident.

The Board found that respondent's argument was not credible on this issue. It concluded that it was unreasonable to believe that the respondent, an experienced litigator faced with a major evidentiary problem concerning the removal and use of the tires, did not fully understand the nature and content of Interrogatory No. 56. The Board was of the opinion that the respondent made a calculated decision to be non-responsive to the question, opting to continue to hide the "bad facts" of the removal and use of the tires.

Smith's initial draft of his report concerning the Capri included a statement that the tires had been removed and used by Walker. At the direction of the respondent, Smith deleted this information from his report.

In the stipulation and in his testimony, respondent claimed that because Smith's opinion regarding the cause of the accident was not in any way affected by the removal and use of the tires, it was unnecessary to supply the information in Smith's report. Respondent, therefore, believed it appropriate to direct Smith to delete any reference to the removal and use of the tires from his report.

On December 5, 1985, Ford's attorney deposed Smith, who was on three occasions asked questions that he believed might require him to disclose the removal of the tires. He asked for brief recesses to consult with respondent. Each time, based upon respondent's interpretation of the language of the question, respondent advised Smith that the question could be answered correctly without disclosing the specifics of the use of the tires by Walker. During the deposition, Smith eventually revealed the removal of the tires by Walker. At a subsequent deposition, Smith admitted and discussed the use of the tires by Walker.

In and apart from the three specific occasions when recesses were taken, the Board was of the opinion that the record of Smith's deposition indicated other occasions when disclosure of the removal and use of the tires should have been made, but Smith continued to be evasive. The Board concluded that Smith's evasiveness was part of respondent's calculated plan to hide or cover up removal and use of the tires.

At the request of Ford's attorney, respondent filed a supplemental response to interrogatories in which Walker admitted the removal and use of the tires.

On May 1, 1986, counsel for Ford filed a motion to dismiss pursuant to Fed.R.Civ.P. 37 and a motion for summary judgment pursuant to Fed.R.Civ.P. 56, requesting that the case be dismissed or that summary judgment should be granted because of respondent's unethical and improper discovery practices. Respondent filed a response.

Judge Kane, without taking testimony, but after a hearing, found that the respondent "has violated a number of the canons

and disciplinary rules of the Code of Professional Responsibility by his willful concealment of the tires episode." He ordered respondent removed as counsel for plaintiffs and ordered him to personally pay the costs incurred in litigating the matter in the amount of $4,536.25. Smith was banished by Judge Kane as an expert in the federal district courts of Colorado. Ford's motion to dismiss the lawsuit was denied.[2] Respondent arranged for substitute counsel and the case was eventually settled for an amount equal to the amount of an offer initially made to plaintiffs prior to depositions, but which offer was subsequently withdrawn.

The Board determined that the actions of respondent, including the testimony of Smith and the answer to Interrogatory No. 56, left no other conclusion than that he engaged in a planned course of conduct to cover up and be unresponsive in the civil discovery process. The Board reasoned that the case would involve disputed expert testimony and possible issues of Walker's credibility and motives in connection with her removal and replacement of the tires. These would be issues for the trier of fact, and respondent, by his actions, engaged in non-responsive discovery techniques in a manner calculated to hide or cover up the tire removal and use issue in an attempt to thwart the truth finding process.

The Board concluded that there was a pattern of conduct by respondent beginning with his and Smith's examination of the vehicle and their knowledge of the removal and use of the tires; his failure to honestly answer Interrogatory No. 56; his request to delete the reference to removal and use of the tires from Smith's report; and his efforts not to disclose the removal and use of the tires during the course of Smith's deposition.

The Board considered respondent's argument that he engaged in legitimate discovery strategy, and while he may have made errors of judgment, those errors did not warrant the imposition of discipline. The Board did not find respondent's position to be persuasive or tenable. While recognizing that the respondent had no duty to voluntarily disclose "bad facts," it was of the opinion that the respondent had an affirmative duty to fairly and accurately respond in the discovery process. The Board concluded that respondent's conduct established both an intent to deceive and to engage in misrepresentation, and such conduct was prejudicial to the administration of justice.

The Board found that respondent had violated DR1–102(A)(4) (conduct involving dishonesty, fraud, deceit, or misrepresentation); DR1–102(A)(5) (conduct that is prejudicial to the administration of justice); and DR7–102(A)(3) (conceal or knowingly fail to disclose that which he is required by law to reveal).

In formulating its recommendation for discipline, the Board took into consideration the duty respondent owed to the public, the legal system, and his client, and that he had no prior disciplinary record, he acted without selfish or dishonest motives, his reputation for integrity, and that he had been publicly chastised by Judge Kane. See ABA Standards for Imposing Legal Sanctions §§ 6, 9 (1986).

## II.

In his objections and exceptions to the findings of the Board and in his brief, the respondent advances two arguments in support of his challenge to the Board's conclusion that he engaged in deceptive discovery practice. First, the Board failed to distinguish between the removal of the

---

**2.** Judge Kane also observed:

Despite the barriers of technicality and quiddities of procedure which infuse our legal system, at enormous cost, to insure that litigation constitute a search for the truth, our ultimate reliance must be found in mutual trust and decency. Though the conduct of plaintiff's counsel and expert offer stark evidence to the contrary, litigation is not a game of hare and hounds where rules are easily bent, where truth is skirted by lies and evasions and cheap victory is sought at the expense of fairness and candor. Even if the cynics are correct in saying that such practices are endemic to the system, it is necessary to say in this case that they will not be tolerated.

We agree with this statement.

tires and the use of the tires. He argues that had that distinction been made, complainant's case would have failed because the respondent had, as found by the Board, no duty to voluntarily disclose "bad facts." Because there was no duty to volunteer information about the use as distinguished from the removal of the tires, the acts relied upon by complainant do not constitute misconduct.

Second, while admitting that Interrogatory No. 56 was not answered correctly or completely for the time frame requested, respondent contends that the Board's finding of his explanation that he misread the interrogatory not credible is not justified. He argues that the Board should have considered whether an absolutely correct and complete answer would have required disclosure of the use of the tires. Since a full and complete response would need only to have detailed the facts and circumstances of the removal of the tires, not their subsequent use, there was no reason, other than mistake, for not having fully answered the question. Accordingly, the only reasonable conclusion is that the incorrect answer was the result of simple negligence.

In *People v. Gibbons*, 685 P.2d 168 (Colo. 1984), we adopted a standard of review that would be applied in determining whether charges of professional misconduct have been established by clear and convincing evidence. "[T]he factual findings of the Grievance Committee are binding upon this court unless, after considering the record as a whole, we conclude that they are clearly erroneous and unsupported by substantial evidence." *Id.* at 173. When a hearing board acts as a fact finder, it has the duty to assess the credibility of all the evidence before it. *People v. Blanck*, 700 P.2d 560 (Colo.1985). Moreover, it is not within the province of this court to measure the weight of the evidence or to resolve the credibility of the witnesses. *People v. Distel*, 759 P.2d 654 (Colo.1988).

In assessing the evidence before it, the Board considered not only the answer to Interrogatory No. 56 and respondent's explanation that he misread the question, but also his request to Smith that he delete certain material from his report and his instructions to Smith during his deposition.

The Board's findings and conclusions were not based on any single incident, but rather on a pattern of conduct that respondent engaged in from the time the lawsuit was filed. The Board's finding that respondent's explanations were not persuasive or tenable goes to the issue of credibility, and as to that issue we defer to the judgment of the Board.

While it is true that the Board did not draw the fine distinction between removal and use of the tires that respondent claims is so vital, we are not persuaded that even accepting that distinction precludes a finding of misconduct. While we can accept respondent's argument that he was under no obligation to volunteer information, he was required to respond in a full, truthful, and complete manner.

Since the respondent admits that a full and complete response to the interrogatory would have mandated disclosure of the removal of the tires by his client, there can be little doubt that such disclosure would have resulted in further questions by Ford concerning the storage or use of the tires during the period that elapsed between their removal and replacement.

### III.

Respondent urges us to impose a sanction no greater than a public censure if we conclude that he engaged in unprofessional conduct. In support of his position, he contends that his conduct was at most negligent, that he has already been sanctioned by the federal district court, he has no record of prior discipline, and he enjoys a good reputation for integrity.

These factors are appropriate for consideration in determining the discipline to be imposed. However, the selection of discipline to be imposed must ultimately be made by this court, and we have set out the factors to be considered and the purposes to be served by disciplinary sanctions. *E.g., People v. Berge*, 620 P.2d 23 (Colo. 1980).

In light of the Board's finding that the respondent engaged in a planned course of conduct to cover up and be unresponsive in the civil discovery process, and that his course of conduct established an intent to deceive and to engage in misrepresentation resulting in conduct prejudicial to the administration of justice, we believe that suspension from the practice of law for six months is warranted.[3]

Accordingly, the respondent is suspended from the practice of law for six months, beginning on November 2, 1989. *See* C.R. C.P. 241.21(a). He is also ordered to pay $1,127.79 for the costs of these proceedings to the Supreme Court Grievance Committee, 600 Seventeenth Street, Suite 500–S, Denver, Colorado 80202–5485, within sixty days of this opinion.

Linda Donnelly, Disciplinary Counsel, and George S. Meyer, Deputy Disciplinary Counsel, Denver, for complainant.

---

**3.** Standard 6.12 of the ABA Standards for Imposing Lawyer Sanctions, provides:

Suspension is generally appropriate when a lawyer knows that false statements or documents are being submitted to the court or that material information is improperly being withheld, and takes no remedial action, and causes injury or potential injury to a party to the legal proceeding, or causes an adverse or potentially adverse effect on the legal proceeding.