721 So.2d 859 (1998)
In re D. Warren ASHY.
No. 98-B-0662
Supreme Court of Louisiana.
December 1, 1998.
Rehearing Denied January 29, 1999.
*860 Charles B. Plattsmier, G. Fred Ours, Baton Rouge, for Applicant.
Darrell W. Ashy, Lafayette, pro se.

LAWYER DISCIPLINARY PROCEEDINGS
VICTORY, J.[*]
This attorney disciplinary matter arises from one count of formal charges filed by the Office of Disciplinary Counsel ("ODC") against D. Warren Ashy ("respondent"), an attorney licensed to practice law in the State of Louisiana.

FACTS AND PROCEDURAL HISTORY
On Friday, October 13, 1995, Charles "Blind Charlie" Williams, accompanied by Regine Kristine Dade,[1] went to respondent's office and requested that he check into whether Williams was the subject of a criminal investigation. According to Williams, he was seeking representation because he had been warned by a personal friend (who was a police officer) that he should "straighten up" because he might be the subject of a pending criminal investigation regarding drugs. No fee was discussed with respondent at that time.
Over the weekend, respondent contacted Dale Broussard of the Louisiana Attorney General's Office and asked him to check if there were any outstanding warrants against Williams. Respondent also spoke to other individuals who gave him some general "bar room gossip" concerning Williams and Dade that suggested they were "into drugs" or might have warrants outstanding for their arrest. At some point in time, either that weekend or the following weekend, respondent testified he received information from another individual who had been arrested for drugs that the individual had "rolled over" or given information to the police about Williams.
On Monday, October 16, respondent called Williams and advised him that he was "hot," and that Dade might also be implicated. Respondent asked for Dade's phone number, which Williams refused to give him. Instead, Dade called respondent at Williams' request and met with him that day at his office. Respondent told her that she and Williams might both be in trouble with the law. During the course of this meeting, respondent told Dade she "had certainly grown up," was "very attractive," and asked if she "minded if he hit on her." He also asked her if she dated older married men and if she would like an older man to take care of her. When he shook her hand, he kissed her without her consent and she pushed him away.
Williams and Dade returned to respondent's office on Tuesday, October 17 and discussed the possibility of the outstanding warrants. At that time, Williams paid respondent $10,000.00 to represent both of them. Respondent placed the funds in his client trust account.
Later that day, Dade met with respondent at his office. Before the hearing committee, Dade testified as follows:
A. Tuesday afternoon he suggested that I come back following the meeting with Mr. Williams by myself, because he had a client coming in. He didn't have enough time to speak with me. So I came back and it was during office hours so I wasn't real nervous and I did have to leave because I taught aerobics that afternoon at *861 5:30 and I had to leave and get across town. So I got there, I guess, around 4:00 or 4:15 and we spoke. And he suggested that he could sell his soul to a friend of his that would make me disappear in the eyes of the law and if I didand I immediately questioned what I would have to do in return for this selling of his soul. And he said that he wanted a relationship with mean ongoing sexual relationship me.
She further testified before the hearing committed that respondent gave her $200.00 so she could buy "something sexy from Victoria's Secret and a nice dress to wear to his office."[2]
On or about October 24, respondent learned from the attorney general's office that no warrants had been issued for Williams or Dade. Also after the October 17 meeting, Williams learned that his police officer friend was only trying to scare him when he told him he was being investigated for drugs and that the friend in fact knew of no such investigation. Based on this knowledge, Williams apparently felt he had been "swindled" out of the $10,000 fee by respondent. He contacted the state police, who investigated the matter as a possible theft by fraud case. Both Williams and Dade gave statements to the state police and agreed to tape record conversations with respondent.
The transcript of the tapes indicates that on October 24, 1995, respondent told his clients at his office there were "distribution" *862 warrants issued for them, although he informed them his information was based on hearsay and indicated he had not seen the actual warrants. That same day or the next day, respondent told Dade by telephone that no warrants were issued for her, and he was working on the warrants issued for Williams. He also told her that although their relationship had "headed in the wrong direction" and was "finished with all that."[3] On October 27, 1995, respondent informed Williams he was using an intermediary to speak with law enforcement about the warrants.
On October 30, Williams initiated a telephone call to respondent and advised respondent that he knew no warrants had been issued against him. That same day, respondent refunded $7,500 of the $10,000 fee. When he later learned the matter became the subject of a criminal investigation, respondent refunded the remainder of the fee on November 6, 1995.[4]
On February 10, 1996, Dade filed a complaint against respondent with the ODC. On August 8, 1996, the ODC filed formal charges against respondent. The charges essentially alleged two acts of misconduct on the part of respondent: (1) in order to receive a fee, respondent misled his clients into believing they were the subject of a criminal investigation; and (2) respondent attempted to have a sexual relationship with Dade in exchange for representing her in connection with the non-existent criminal charges.[5] Respondent filed an answer denying any misconduct, and a formal hearing was conducted.
After the conclusion of the hearing, the hearing committee filed its findings and recommendation with the disciplinary board. As to the first allegation, it determined that there was insufficient evidence that respondent had misinformed his clients regarding the existence of a criminal investigation against them in order to earn a fee fraudulently. It found respondent, based on the "quality and weight of the information received" in his investigation, had reasonably concluded Williams and Dade may have been the subject of criminal investigations. The committee noted respondent kept the $10,000 fee in his trust account at all times, and ultimately refunded the fee in its entirety. Thus, the committee found no violation of Rule 1.5 relating to failure to refund an unearned fee.
As to the second allegation regarding the sexual relationship, the hearing committee stated that, based on its observation of the demeanor of the witnesses, "[w]e have no doubt that the evidence taken as a whole is clear and convincing that the encounters between Dade and respondent happened exactly as she described them. Responded attempted a sexual relationship with her in exchange for certain efforts he would exert on her behalf as her lawyer." While noting that there is no specific prohibition in the professional rules against attorney-client sexual relationships, the committee found such a prohibition was "implicit in some of the Rules, or, is a natural corollary to one or more of them."[6] Relying on the ABA Standards *863 for Imposing Lawyer Discipline,[7] and finding an absence of either mitigating or aggravating factors, the committee recommended respondent be publicly reprimanded.
On March 16, 1998, the disciplinary board issued its recommendation to this court. The board agreed with the findings of the hearing committee and with the imposition of a public reprimand. One board member dissented, noting Dade testified respondent touched her in a sexual manner and "would not let her pull away," which constituted sexual battery pursuant to La. R.S. 14:43(1) and warranted a lengthy suspension.
The ODC filed a timely objection in this court to the disciplinary board's recommendation. Accordingly, pursuant to Supreme Court Rule XIX, § 11(G)(1)(b), the matter was set for oral argument.

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this Court and, thus, we act as triers of fact and conduct an independent review of the record to determine whether alleged misconduct has been proven by clear and convincing evidence. In re Quaid, 94-1316 (La.11/30/94), 646 So.2d 343 (citing La. Const. Art. 5, § 5(B); Sup Ct. Rules, Rule 19, Lawyer Disciplinary Enforcement Rule, § 18, Subd. C, 8 La.Rev.Stat.).

A. The $10,000.00 fee
The ODC contents that the hearing committee and disciplinary board erred in ruling that the evidence does not clearly and convincingly prove respondent attempted to earn the $10,000 fee by misleading his clients with false information. Particularly, the ODC points out that respondent told his clients there were "distribution warrants" out for them when in truth and in fact there never were warrants issued nor was there any ongoing investigation of them. The ODC contends that respondent knew the truth on or about October 24 but, as late as October 30, during a telephone conversation with Williams, continued to attempt to deceive by maintaining that he had been told warrants had been issued. The ODC further argues that respondent failed to refund any of the $10,000 fee until confronted with the knowledge that his clients knew the truth.
All of this is very troubling, especially when most of the evidence supporting respondent's version of these events comes from respondent and his credibility on the sexual advances issue was squarely rejected by the hearing committee and the disciplinary board. Nonetheless, and though we share the ODC's concern, we ultimately conclude that the evidence does not quite meet the standard of clear and convincing.[8] In any event, respondent quickly refunded the entire fee, although he clearly had earned part of it.

B. The Sexual Advances
The ODC also charged respondent in Count I of "inform[ing] [Dade] that you wanted to have a sexual relationship with her in exchange for representing her relative to *864 the non existent arrest warrant." The hearing committee found that "Respondent attempted a sexual relationship with her in exchange for certain efforts he would exert on her behalf as her lawyer."
After a full review of the record, we agree with these findings. The hearing committee found:
From the cold, written record, one might conclude the evidence on both sides to be equally persuasive. However, we carefully observed the demeanor and body language of Dade and Respondent as they testified. We have no doubt that the evidence taken as a whole is clear and convincing that the encounters between Dade and Respondent happened exactly as she described them. Respondent attempted a sexual relationship with her in exchange for certain efforts he would exert on her behalf as her lawyer.
Accordingly, based on our review of the record and the hearing committee's credibility determination based on the witnesses' demeanor, we find that the ODC proved by clear and convincing evidence that respondent attempted a sexual relationship with Dade in exchange for certain efforts he would exert on her behalf as her lawyer.
In light of this factual finding, the issue becomes whether respondent's actions violated the Rules of Professional Conduct. As the hearing committee recognized, such conduct is not specifically addressed by the Rules of Professional Conduct. However, for the reasons expressed below we find that such conduct violates Rules 1.7, 2.1 and 8.4.
The American Bar Association has addressed the general issue of sexual relationships between attorneys and clients in Formal Ethics Opinion No. 92-364 and concluded as follows:
A sexual relationship between lawyer and client may involve unfair exploitation of the lawyer's fiduciary position, and/or significantly impair a lawyer's ability to represent the client competently, and therefore may violate both the Model Rules of Professional Conduct and the Model Code of Professional Responsibility.
While recognizing that the present rules did not specifically address the issue, the opinion found that the following existing rules were potentially implicated:
First, because of the dependence that so often characterizes the attorney-client relationship, there is a significant possibility that the sexual relationship will have resulted from exploitation of the lawyer's dominant position and influence and, thus breached the lawyer's fiduciary obligations to the client. Second, a sexual relationship with a client may affect the independence of the lawyer's judgment. Third, the lawyer's engaging in a sexual relationship with a client may create a prohibited conflict between the interests of the lawyer and those of the client. Fourth, a non-professional yet emotionally charged, relationship between attorney and client may result in confidences being imparted in circumstances where the attorney-client privilege is not available, yet would have been absent the personal relationship.
ABA Formal Ethics Opinion No. 92-364 (1992).
The drafters of the opinion also noted that the criminal client may be particularly dependent on the lawyer. Id. at p. 1001:124. See also Oklahoma Bar Association Opinion No. 308 (12/9/94) (finding that "[a] lawyer may not engage in a sexual relationship with a client, or a client's representative, during their lawyer-client relationship, except where the client is the lawyer's spouse" and that "[c]lients involved in domestic, child custody, criminal, and pro bono matters are particularly vulnerable to abuse of such [confidential client] information.").
While this case does not involve a consensual sexual relationship, it involves conduct in which an attorney used his position to proposition his client in a sexual manner with the threat that he would not exert all his legal efforts in defending her case if she did not consent. This presents the intolerable situation envisioned by the drafters of the ABA opinion that "the client may not feel free to rebuff unwanted sexual advances because of fear that such a rejection will either reduce the lawyer's ardor for the client's cause or, worse yet, require finding a new lawyer, ..." *865 ABA Formal Ethics Opinion No. 92-364 at p. 1001:123.
This court has never addressed this situation. The only opinions from this court that involve sexual misconduct by an attorney are In re Redd, 95-1472 (La.9/15/95), 660 So.2d 839, In re Plaisance, 98-0345 (La.3/13/98), 706 So.2d 969, and In re Bonnie, 97-2729 (La.12/12/97), 704 So.2d 1179. In Redd, the attorney was the legal advisor to the Baton Rouge Police Department whose duty was to issue permits to exotic dancers. The attorney entered a guilty plea to a charge of simple battery involving the touching and taking photographs of a permit applicant's breasts. This court noted that the offense did not involve sexual misconduct with a client, but since part of Redd's job was the licensing of exotic dancers, his sexual misconduct towards the applicant "revealed a serious flaw in respondent's fitness to practice law." 660 So.2d at 840. After noting several mitigating factors, we suspended Redd from the practice of law for one year and one day and ordered him to obtain one year of psychiatric treatment. Id. at 841.
In Plaisance, we accepted the consent discipline of disbarment for an attorney who attempted to videotape female employees in his law firm's restroom without their knowledge. 706 So.2d 969. In Bonnie, we denied a proposed consent discipline of a public reprimand and twelve months probation for an attorney who, during a nine month period of representation, made improper sexual advances towards his client's wife, and offered her sums of money in exchange for sexual favors. 704 So.2d 1179.
An examination of the jurisprudence of other states involving attorney disciplinary actions for sexual misconduct reveals a wide spectrum of factual situations, ranging from consensual sexual relations between attorney and client to sexual battery upon the client. Courts have concluded that such conduct rises to the level of a violation of the rules and have imposed sanctions ranging from public reprimand to disbarment.[9]
*866 Several state courts have been confronted with factual situations similar to the case at bar, wherein an attorney makes unwanted sexual advances to a client. In Matter of Piatt, 951 P.2d 889, 191 Ariz. 24 (1997), an Arizona attorney was disciplined for making sexual advances to two clients and threatening that they would have to pay more money for his legal services if they did not respond to his advances. Piatt argued that he should not be punished because his conduct was not clearly unethical at the time it was committed. The Arizona Supreme Court rejected his arguments as follows:
A lawyer is a fiduciary with a duty of loyalty, care, and obedience to the client. The relationship is, and must be, one of utmost trust. It matters not that the words "sexual harassment" are not used in our Rules of Professional Conduct. ER 1.7(b) prohibits a lawyer from representing a client if that representation is going to be materially limited "by the lawyer's own interests." Clearly, sexual harassment by a lawyer serves the lawyer's interest and not the client's. Asking wholly inappropriate questions and making obscene comments to a client undermines trust in the lawyer and the representation.
Indeed, this case went beyond sexual harassment. Piatt told client A that unless she responded sexually to him he could no longer represent her unless she came up with a lot more money. Client A had already invested time and energy in Piatt as her lawyer. It is hard to imagine a more egregious case of putting one's interests ahead of the client's.
... We continue to believe the obvious that we do not need a specific rule against attempting to extort sexual conduct from a client.
In spite of the strong language the court used in attacking the attorney's conduct, the attorney was sentenced to the relatively light punishment of a public censure with one year supervised probation.
In Matter of Gilbert, the court determined that an attorney violated DR 1-102(A)(7) and 5-101(A) and should be suspended for one year for making unwanted and unsolicited sexual advances to two women clients during the course of his representation of them, as well as inappropriate comments of a sexual nature to two female secretaries in his office. 194 A.D.2d 262, 606 N.Y.S.2d 478 (N.Y.A.D. 4th Dept.1993). In People v. Crossman, an attorney was suspended for one year and one day for soliciting sexual favors in exchange for legal fees on three separate occasions with three prospective clients (including, in one case, kissing client's breast). 850 P.2d 708 (Colo.1993). The court found that the conduct violated DR 1-102(A)(6) (engaging in conduct adversely reflecting on fitness to practice law) and DR 5-101(A) (lawyer shall not accept employment if lawyer's professional judgment will be or may be affected by his own interests). There, the court stated that "[t]he lawyer stands in a fiduciary relationship with the client and by making unsolicited sexual advances to a client `perverts' the very essence of the lawyer-client relationship." Id. at 711 (citing Matter of Disciplinary Proceedings Against Gibson, 124 Wis.2d 466, 369 N.W.2d 695, 699-700 (1985), appeal dism'd sub nom., Gibson v. *867 Board of Attorneys Professional Responsibility of Wisconsin, 474 U.S. 976, 106 S.Ct. 375, 88 L.Ed.2d 330 (1985)).
In Matter of Wood, an attorney, who had previously been disciplined for misconduct involving the exchange of legal services for sexual favors, was disbarred for engaging in the same type of conduct and for arranging for an underage girl to be employed in the making of pornographic movies. 489 N.E.2d 1189 (Ind.1986). See also People v. Bergner, 873 P.2d 726 (Colo.1994) (an attorney was publicly censured for making improper sexual statements to a divorce client which was found to be a violation of DR 1-102 (conduct that adversely reflects on the lawyer's fitness to practice law)); State ex rel. Oklahoma Bar Association v. Sopher, 852 P.2d 707 (Okla. 1993) (attorney violated Rule 8.4 and was publicly reprimanded for looking down client and client's mother's blouses and making lewd comments); Matter of Adams, 428 N.E.2d 786 (Ind.1981) (attorney publically reprimanded for grabbing female client, kissing her and raising her blouse which constituted illegal conduct involving moral turpitude and conduct which adversely reflects on his fitness to practice law in violation of DR 1-102(A)(3) and (6)).
Although in the above cases the punishment varied with the specific facts of each case, in all instances the sexual misconduct resulted in a violation of the existing rules of attorney conduct, even though those states did not have a specific rule governing sexual relations or sexual misconduct with clients. Likewise, we find that even though sexual relations or sexual misconduct with a client is not specifically addressed in our present Rules of Professional Conduct, respondent's conduct violates several existing rules.
First, respondent's conduct violates Rule 1.7(b) which states: "A lawyer shall not represent a client if the representation of that client may be materially limited by ... the lawyer's own interests, unless; (1) The lawyer reasonably believes the representation will not be adversely affected; and (2) The client consents after consultation." As stated in Piatt, such conduct violates Rule 1.7(b) because "sexual harassment by a lawyer serves the lawyer's interest and not the client's. Asking wholly inappropriate questions and making obscene comments to a client undermines trust in the lawyer and the representation." Furthermore, as in Piatt, this case went beyond sexual harassment. Respondent told Dade that unless she responded sexually to him he would not put forth his best efforts to represent her. "It is hard to imagine a more egregious case of putting one's interests ahead of the client's." Id., 191 Ariz. 24, 951 P.2d 889. Clearly, in this case, respondent could not have reasonably believed his representation of Dade would not be adversely affected by his conduct, nor did Dade consent after consultation.
Respondent's conduct also violates Rule 2.1 which states that "[i]n representing a client, a lawyer shall exercise independent professional judgment and render candid advice." As the annotations to that rule provide:
"Emotional detachment," in the words of the ABA's Ethics Committee, is "essential to the lawyer's ability to render competent legal services." A lawyer who engages in a sexual relationship with a client, the committee concluded, risks losing "the objectivity and reasonableness that form the basis of the lawyer's independent professional judgment." Because of this threat to independent judgment, and because of the problems of confidentiality and conflicts of interest that lawyer-client sex presents, the committee concluded that a lawyer would be "well advised to refrain from such a relationship."
Annotations to Model Rule 2.1, p.271 (citing ABA Committee on Ethics and Professional Responsibility Formal Opinion 92-364 (1992)). In this case, respondent promised to undertake special efforts on behalf of Dade only if she entered into a sexual relationship with him and not based on what efforts were necessary to her legal defense based on his independent professional judgment.
Respondent's conduct also violates Rule 8.4 which provides that "[i]t is professional misconduct for a lawyer to: (a) violate or attempt to violate the Rules of Professional Conduct ...; (b) commit a criminal act especially one that reflects adversely on the lawyer's honesty, trustworthiness or fitness as a lawyer in other respects; (c) engage in conduct *868 involving dishonesty, fraud, deceit or misrepresentation; (d) engage in conduct that is prejudicial to the administration of justice; ..." "Rule 8.4 also reaches instances of criminal sexual misconduct or sexual exploitation of a nature that indicates the lawyer is unworthy of the confidence reposed in him or her." Annotations to Model Rule 8.4, p. 563. We find that respondent's conduct here to be "sexual exploitation of a nature that indicates he is unworthy of the confidence reposed in him."
Having found a violation of several of the existing rules, we must now determine what level of sanction is appropriate. "In fashioning the appropriate discipline, we must take into account the seriousness of the offense, any aggravating and mitigating circumstances, and the purpose of lawyer discipline proceedings." In re King, 94-0686 (La.11/30/94), 646 So.2d 326.
Although both the hearing committee and disciplinary board recommended a public reprimand, we find such a sanction to be too lenient based on the facts of this case. First we consider the seriousness of this offense. Dade stated that, as a result of his misrepresentations and threats, the following occurred:
I said well I'll do what I have to do but I just don't want to get in trouble and he said that he wanted me to tell him that we will make love, he wanted me, he proceeded to touch my breast and my rear end and he put my hand on his crotch, he told me he wanted me to touch him. Ah he kissed me, he you know held me to him, he wouldn't let me pull away.
The hearing committee footnoted this quote noting that respondent described this as a "simple kiss."
A client should come to an attorney with the confidence that the attorney will use his independent legal judgment in putting forth his best legal efforts to represent the client. An attorney who threatens to limit his efforts on his client's behalf if the client fails to engage in a sexual relationship with him has committed a very serious ethical offense. This undermines confidence in the legal system and is prejudicial to the administration of justice.
We find no aggravating or mitigating circumstances that would justify a departure from the sanction to be imposed.
Finally, we consider the primary purposes of lawyer disciplinary proceedings which is "maintaining appropriate standards of professional conduct, preserving the integrity of the legal profession, and deterring other attorneys from engaging in ethical violations. Such proceedings are not designed solely to punish the attorney." In re Redd, supra at 840.
In conclusion, we find that the conduct in this case is more egregious than the conduct in In re Redd. Further, in In re Redd, the attorney had no fiduciary relationship with the victim of the sexual misconduct as she was not a client. Therefore, we find that a suspension of two years, which is longer than the suspension imposed in In re Redd, is the appropriate sanction in this case.

DECREE
For the reasons stated herein, it is the decision of this Court that respondent, D. Warren Ashy, be suspended from the practice of law for a period of two years. All costs of these proceedings are assessed against respondent.
NOTES
[*] Knoll, J., not on panel. Rule IV, Part 2, § 3.
[1] Ms. Dade, a college student living with her parents, was paid by Mr. Williams, who is sight impaired, to perform tasks such as opening his mail. Ms. Dade was a former client of respondent, having been represented by him when she was fifteen years of age.
[2] Dade gave a recorded statement on October 24 to the Louisiana State Police, which statement was admitted into evidence and considered by the hearing committee to be sworn testimony, in which she describes the events of that meeting as follows:

He told me that you know ah I'm hot as a firecracker that he's so mad at me he could rip my head off because ah you know I'm more involved than I thought I was, and I wasn't. And he said that they had been watching us for about six months and that he could take care of it all, he knew somebody that if he sold his soul to his friend that everything would be taken care of and nothing would happen to me no matter how bad I messed up. And I stood up at that point and he was sitting by me and he had taken my hands and I was sitting by him and I was very upset because I knew what he was getting at, and I said well what is it gonna cost me and he said nothing, nothing, nothing then he went on to tell me you know that he would have to sell his soul to his friend but nothing you know bad would ever happen to me he would never let anything bad happen to me and he said that he wanted he's extremely attracted to me and he wanted an ongoing relationship with me and a sexual relationship with me and he wanted us to be lovers, and you know I told him, I'm just a little girl you know I don't want that, I still live with my parents, I'm not you know, I haven't grown up, I'm not ready for anything like that and I got upset and I started crying, and he told me that if every time I saw him I would start crying and things wouldn't work and he wouldn't be able to take care of everything. So ah I proceeded to say I asked him what he was going to tell his friend, he said well don't worry, he was going to tell his friend that he was sorry he wasted his time. And so I said well I'll do what I have to do but I just don't want to get in trouble and he said that he wanted me to tell him that we will make love, he wanted me, he proceeded to touch my breast and my rear end and he put my hand on his crotch, he told me he wanted me to touch him. Ah he kissed me, he you know held me to him, he wouldn't let me pull away and this was during office hours so I didn't know how to react I was scared because he kept telling us how much power he had and how he'd do all these things, you know, I didn't know if he could hurt me if he would set me up you know with drugs or something to that effect. And ah he wanted to, he told me that he had a friend, he ah kept an apartment in Lafayette but lived in Houston, would I have problems meeting him there, he wanted me to call him everyday just to find out what, how my day was, how his day was, what we were doing, ah he left the office to get two hundred dollars and he put it in my purse and he told me he wanted me to go to the mall and buy clothes, buy a dress to wear to the office and buy some sexy lingerie from Victoria Secret or somewhere that I could call him and tell him about and show him later. He told me that he would, I told him that I was very self conscious but I had very high self esteem and he said that he would never do anything to lower my self esteem but he would get rid of my self consciousness. Ah and he kissed me again and he told me that he needed to hear from me daily, and you know we'd work on my, my insecurities. And ah he told me that if I didn't sleep with him that being where he was he would do what he could to you know take care of everything but he wouldn't guarantee that everything would be taken care of but if I did everything would disappear.
Respondent's testimony as to this meeting differed from that of Dade. He claimed that she was acting very flirtatious and approached him regarding the sexual relationship. While he admitted he gave her $200, he said it was for her to go to the mall to buy herself a gift because he "was very attracted" to her and they were "flirting with each other."
[3] The ODC orally argued that respondent became suspicious of Williams and Dade at that time, thus perhaps accounting for his retreat from the relationship.
[4] On November 6, 1995, the state police searched respondent's office pursuant to a warrant under the suspicion that respondent had taken the $10,000 by fraud. On May 10, 1996, the district attorney elected not to file criminal charges because (1) respondent had deposited the fee in a trust account; (2) he was retained for a lawful investigation; (3) respondent undertook efforts at the investigation; and (4) when Williams advised respondent of his dissatisfaction with those efforts, respondent refunded the entire fee.
[5] The charges alleges the following violations of the Rules of Professional Conduct: Rule 1.5 (failure to refund fee); Rule 1.7(b) (representing a client with a present conflict of interest); Rule 1.8 (providing client financial assistance); Rule 8.4(a) (violation of Rules of Professional Conduct); Rule 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation); Rule 8.4(d) (engaging in conduct prejudicial to the administration of justice); and Rule 8.4(e) (suggesting attorney is able to improperly influence judge or governmental official).
[6] The hearing committee cited to the commentaries to Rule 1.7(b) relating to the interference of a "lawyer's own interests" that may materially influence a client's representation, Rule 1.8 pertaining to a breach of fiduciary obligations, Rule 2.1 requiring a lawyer to exercise "independent professional judgment," and Rule 8.4 dealing with criminal acts adversely reflecting on an attorney's fitness to practice, as well as an ABA Ethics Committee Opinion No. 92-364 (1992) advising attorneys to refrain from sexual relationships with clients.
[7] ABA Standard 4.62 provides suspension is generally appropriate when a lawyer knowingly deceives a client and causes injury or potential injury to the client. Standard 7.2 provides suspension is generally appropriate when a lawyer knowingly engages in conduct that is a violation of a duty owed to the profession, and causes injury or potential injury to a client, the public, or the legal system.

ABA Standard 4.63 provides reprimand is generally appropriate when a lawyer negligently fails to provide a client with accurate or complete information, or causes potential injury to the client. Standard 7.3 provides reprimand is generally appropriate when a lawyer negligently engages in conduct that is a violation of a duty owed as a professional and causes injury or potential injury to a client, the public, or the legal system. Standard 4.33 provides reprimand is generally appropriate when a lawyer is negligent in determining whether the representation of a client may be materially affected by the lawyer's own interests, or whether the representation will adversely affect another client, and causes injury or potential injury to a client.
[8] The tape recorded conversations reveal that respondent told his clients that he had not seen the actual warrants and his knowledge was based on hearsay. The bar owner testified that he told respondent that he had heard there were warrants issued for Williams and Dade.
[9] Public reprimands were imposed in the following cases: Disciplinary Counsel v. DePietro, 71 Ohio St.3d 391, 643 N.E.2d 1145 (1994) (attorney engaged in consenting, sexual relationship with personal injury client, then married and divorced her); Disciplinary Counsel v. Paxton, 66 Ohio St.3d 163, 610 N.E.2d 979 (attorney engaged in romantic relationship with divorce client); People v. Zeilinger, 814 P.2d 808 (Colo. 1991) (attorney engaged in sexual relations with client); Committee on Professional Ethics and Conduct v. Durham, 279 N.W.2d 280 (Iowa 1979) (female attorney visited male client in her professional capacity at the penitentiary and engaged in kissing, caressing and fondling).

Suspensions were imposed in the following cases: In re Heard, No. 12272-5 (Wash.9/24/98) (attorney suspended for two years for engaging in sexual relations with client); In re Rinella, 677 N.E.2d 909, 175 Ill.2d 504, 222 Ill.Dec. 375 (1997), cert. denied, ___ U.S. ___, 118 S.Ct. 371, 139 L.Ed.2d 288 (1997) (attorney suspended for three years for engaging in sexual relations with clients); People v. Good, 893 P.2d 101 (Colo. 1995) (attorney suspended for one year for having sexual relationship with client); Matter of Lewis, 262 Ga. 37, 415 S.E.2d 173 (1992) (attorney received three-year suspension for engaging in sexual relationship with divorce client); In re Appler, 669 A.2d 731 (D.C.1995) (attorney suspended for 90 days for engaging in sexual relationship with representative of corporate client; attorney also disbarred for fraudulent billing); Drucker's Case, 133 N.H. 326, 577 A.2d 1198 (1990) (attorney received two-year suspension when he engaged in sexual relations with client who was under the care of a psychiatrist and emotionally fragile; and he failed to pursue an arbitration matter); Matter of Bowen, 150 A.D.2d 905, 542 N.Y.S.2d 45 (N.Y.App.Div.1989) (attorney received two-year suspension for engaging in sexual affairs and making improper advances to clients); The Florida Bar v. Samaha, 557 So.2d 1349 (Fla.1990) (attorney suspended one year for touching the back and thighs of a nineteen year old client while taking seminude photographs which were unnecessary for her personal injury case); Matter of Wells, 572 N.E.2d 1290 (Ind. 1991) (attorney suspended for three years for engaging in unsolicited or nonconsensual touching of young men during course of professional association and for playing pornographic videotapes to high school students visiting his office); Committee on Professional Ethics & Conduct v. Hill, 436 N.W.2d 57 (Iowa 1989) (attorney indefinitely suspended for at least three months for having sexual relations with a divorce client); Matter of Discipline of Bergren, 455 N.W.2d 856 (S.D.1990) (attorney suspended for one year for having sexual relationships with two clients and for kissing and providing an alcoholic beverage to a minor girl); Matter of Disciplinary Proceedings Against Ridgeway, 158 Wis.2d 452, 462 N.W.2d 671 (1990) (attorney suspended for six months for initiating and engaging in sexual contact with a client being represented for possible parole revocation and for providing beer contrary to the conditions for her parole); Matter of Disciplinary Proceedings Against Woodmansee, 147 Wis.2d 837, 434 N.W.2d 94 (1989) (attorney suspended for three years after being convicted of fourth-degree sexual assault on a client).
Disbarment was imposed in the following cases, some of which involved additional unprofessional conduct: People v. Gibbons, 685 P.2d 168 (Colo.1984) (sixty-six year old attorney who represented multiple criminal defendants, including a husband and wife, engaged in covert sexual relationship with the twenty-three year old wife who complained that she was required to engage in sexual relations as a condition of his representation); Matter of Stanton, 103 N.M. 413, 708 P.2d 325 (1985) (assistant public defender convicted of attempted criminal sexual contact in the fourth degree for attempted sexual contact on one of his clients); State v. Heilprin, 59 Wis.2d 312, 207 N.W.2d 878 (1973) (attorney suspended indefinitely when he talked obscenely to clients, exposed himself, and touched female clients on chest and in pelvic area. Heilprin was subsequently disbarred when he directed sexually explicit and suggestive comments and questions to two female clients during office conferences. Matter of Disciplinary Proceedings Against Heilprin, 168 Wis.2d 1, 482 N.W.2d 908 (1992), cert. denied, 506 U.S. 972, 113 S.Ct. 461, 121 L.Ed.2d 369 (1992)); Otis' Case, 135 N.H. 612, 609 A.2d 1199 (1992) (disbarring attorney for violating several ethical rules by pursuing sexual relationship with a client); Matter of Berg, 264 Kan. 254, 955 P.2d 1240 (1998) (attorney disbarred for engaging in inappropriate sexual behavior with numerous clients who were very vulnerable and committed a sexual battery on one client).