877 So.2d 71 (2004)
In re Robert T. DeFRANCESCH.
No. 2004-B-0289.
Supreme Court of Louisiana.
July 2, 2004.
Charles B. Plattsmier, G. Fred Ours, Baton Rouge, Counsel for Applicant.
Ralph Capitelli, New Orleans, Counsel for Respondent.

ATTORNEY DISCIPLINARY PROCEEDINGS
PER CURIAM.
This disciplinary matter arises from one count of formal charges filed by the Office of Disciplinary Counsel ("ODC") against respondent, Robert T. DeFrancesch, an attorney licensed to practice law in Louisiana but currently on interim suspension.[1]

UNDERLYING FACTS AND PROCEDURAL HISTORY
The underlying facts are not seriously disputed. In 1999, Nicole Wattigney retained respondent to represent her in a *72 criminal matter stemming from a misdemeanor drug possession charge. Ms. Wattigney ultimately pleaded guilty to that charge. After the representation ended, respondent and Ms. Wattigney had sexual relations on several occasions over a period of four to six months, in exchange for which respondent provided financial assistance to Ms. Wattigney.[2]
In 2001, Ms. Wattigney was arrested in Jefferson Parish and charged with felony drug possession. Respondent agreed to handle the matter for a fee of $2,000, which Ms. Wattigney paid in installments that were due weekly. After some negotiation with the Jefferson Parish District Attorney's Office, respondent arranged for Ms. Wattigney to participate in a pre-trial diversion program. However, Ms. Wattigney declined this opportunity and decided that she would prefer to plead guilty to the criminal charges.
On the morning of Monday, October 15, 2001, respondent appeared in court with Ms. Wattigney for a hearing in the criminal case. Ms. Wattigney did not make her fee installment payment that day, so respondent proposed that she accompany him to Mississippi for a sexual rendezvous as a "punishment" for failing to pay timely. Respondent told Ms. Wattigney to call him the next day, Tuesday, October 16, 2001, to confirm the details of the arrangement. Ms. Wattigney did not call respondent on Tuesday, but instead sought the advice of her parents regarding respondent's demands.
Ms. Wattigney's father contacted the ODC, and in turn, the ODC's staff investigator conducted a telephone interview of Ms. Wattigney and her father. Following the interview, the ODC proposed that it be allowed to tape record conversations between Ms. Wattigney and respondent. Ms. Wattigney agreed to allow the conversations to be tape recorded.
On Friday, October 19, 2001, the ODC's investigator initiated two conference calls between Ms. Wattigney and respondent. During both conversations, respondent explained to Ms. Wattigney that she would be required to have sex with him as a "punishment" for not paying her fee installments on time. Ms. Wattigney expressed reluctance to agree to respondent's demands, explaining that she had recently been engaged and was "trying to make everything right" with her fiance. Respondent acknowledged that Ms. Wattigney might not be "enthused about doing it," but analogized his demand for sex "as a penalty fee, like, [on a] Discover card." Respondent told Ms. Wattigney that once she took care of her "business," then "we'll be square and I'll be taking care of you again." When Ms. Wattigney continued to protest, respondent assured her that so long as she paid her fee installments on time each week thereafter, "this will never happen again, okay. But, if you miss, then that's the punishment, that's the late fee, that's the whatever you want to call it, okay." At the conclusion of the conversation on Friday, respondent instructed Ms. Wattigney to call him on Sunday night to make arrangements to "take care of business."
Ms. Wattigney did not speak with respondent again until Monday, October 22, 2001, at which time the ODC's investigator *73 initiated and taped a third conversation between respondent and Ms. Wattigney. During this conversation, respondent withdrew his request that Ms. Wattigney have sex with him, suggesting there was "no sense aggravating everybody over this."
Following the October 22, 2001 conversation, respondent had no further contact with Ms. Wattigney until November 29, 2001. On that date, at Ms. Wattigney's request, respondent appeared in court when Ms. Wattigney entered a guilty plea in her criminal case.[3] There is no evidence in the record that respondent and Ms. Wattigney had sexual relations during the 2001 representation, nor that they ever discussed the "sex as punishment" issue any further.

DISCIPLINARY PROCEEDINGS
The ODC filed one count of formal charges against respondent, alleging that his conduct violated the following provisions of the Rules of Professional Conduct: Rules 1.5(a) (a lawyer's fee shall be reasonable), 1.7(b) (a lawyer shall not represent a client if the representation may be materially limited by the lawyer's own interests), 1.8 (prohibited transactions between a lawyer and a client), 2.1 (a lawyer shall exercise independent professional judgment in the representation of a client), 8.4(a) (violation of the Rules of Professional Conduct), 8.4(c) (engaging in conduct involving dishonesty, fraud, deceit, or misrepresentation), and 8.4(d) (engaging in conduct prejudicial to the administration of justice). In his answer to the formal charges, respondent denied that his actions violated the Rules of Professional Conduct; alternatively, respondent expressed remorse for his conduct. The matter then proceeded to a formal hearing on the merits.
At the hearing, the parties entered into stipulations and respondent admitted to the misconduct charged in the formal charges. The ODC called its staff investigator and Ms. Wattigney's father to testify in person before the committee, and introduced the tapes and transcripts of the three telephone conversations between respondent and Ms. Wattigney. Respondent testified on his own behalf and called Ms. Wattigney to testify. In her testimony, Ms. Wattigney stated that she was satisfied with the representation respondent provided in both of her criminal cases. She also explained that she no longer wished to pursue a complaint against respondent, whom she described as "a great guy" and "a friend of mine."[4]

Hearing Committee Recommendation
Based on the evidence presented at the hearing, the committee made a finding of fact that an attorney-client relationship existed between respondent and Ms. Wattigney and that respondent attempted to coerce Ms. Wattigney to have sexual relations with him as a penalty for not paying legal fees to him on time. However, the committee determined that respondent subsequently dropped his demands for sexual relations with Ms. Wattigney. It also made a finding of fact that prior to the incident forming the basis of the instant charges, respondent had sexual relations *74 with Ms. Wattigney on several occasions in exchange for financial assistance.
Based on these factual determinations, the committee concluded that respondent violated the Rules of Professional Conduct as charged in the formal charges. Specifically, the committee found that respondent violated Rule 1.5(a) by attempting to coerce sex from Ms. Wattigney as a late payment fee. Respondent violated Rules 1.7(b) and 1.8 by attempting to coerce Ms. Wattigney to have sexual relations with him during the legal representation, which created an inherent conflict of interest. Respondent failed to act as an independent advisor to his client, a violation of Rule 2.1, when he solicited Ms. Wattigney to have sex with him. Finally, respondent violated Rules 8.4(a), 8.4(c), and 8.4(d) by his attempt to have sexual relations with Ms. Wattigney. Respondent used his position as an attorney to improperly require his client to have sex with him, and he attempted to take advantage of his client for his own sexual gratification.
The committee determined that respondent violated duties to the legal system and the profession, but concluded that he primarily violated his duties to his client, Ms. Wattigney. Respondent's conduct was clearly willful and intentional. Although respondent's misconduct caused neither economic loss to Ms. Wattigney nor a loss of freedom, his conduct was emotionally troubling to Ms. Wattigney and to her family, and had the potential to cause serious injury to Ms. Wattigney. Relying on the ABA's Standards for Imposing Lawyer Sanctions as well as this court's opinions in In re: Ashy, 98-0662 (La.12/1/98), 721 So.2d 859, and In re: Gore, 99-3213 (La.1/28/00), 752 So.2d 853, the committee determined that the baseline sanction for respondent's conduct is a two-year suspension from the practice of law.
The only aggravating factor recognized by the committee is respondent's substantial experience in the practice of law (admitted 1976). The committee found the following mitigating factors are present: absence of a prior disciplinary record, remorse, and a cooperative attitude toward the proceedings. Finding the mitigating factors outweigh the lone aggravating factor, the committee concluded that deferral of at least half of the baseline sanction is warranted. Accordingly, the committee recommended that respondent be suspended for two years, with all but one year deferred, conditioned upon a two-year period of probation.
The ODC filed an objection to the leniency of the sanction recommended by the hearing committee. Respondent did not object to the hearing committee's recommendation.

Disciplinary Board Recommendation
The disciplinary board concurred in the hearing committee's factual findings and application of the Rules of Professional Conduct. The board found that respondent intentionally violated duties owed to his client and as a professional when he attempted to coerce his client into a sexual act as a penalty for failing to pay a weekly installment on a legal fee. Respondent's conduct did not cause tangible harm to the client, but resulted in emotional distress to her family.
The board found the record supports the aggravating factors of dishonest or selfish motive and substantial experience in the practice of law. In mitigation, the board recognized respondent's remorse.
Turning to the issue of an appropriate sanction, the board examined the Ashy and Gore cases. The board observed that Ashy is factually similar to the instant matter. The respondent in Ashy made unwanted sexual advances to his client in *75 exchange for his legal services on her behalf in an alleged drug matter. He also gave her $200 to buy lingerie and a dress to wear to his office. In exchange for an ongoing sexual relationship, Ashy promised his client that he would make a drug investigation involving her go away; however, Ashy knew that his client was not actually the subject of an investigation. Before a sexual encounter occurred, Ashy called off his demand for a sexual relationship. This court suspended Ashy for two years.
Gore involved a consent discipline stemming from a consensual sexual relationship. Gore was suspended for six months with two years of supervised probation for engaging in a consensual sexual relationship during his representation of a client in a divorce proceeding and for failing to advise his client of the potential conflict of interest. This court distinguished Gore's conduct from Ashy's conduct, noting that Gore involved consensual sex as opposed to coerced sex in Ashy.
Considering these cases, the board concluded that respondent's conduct falls between that found in Ashy and in Gore. While respondent attempted to coerce Ms. Wattigney into a sexual relationship, he did not fabricate a story of a drug investigation like Ashy did. Nevertheless, the board felt that the gravity of respondent's misconduct warranted his having to apply for reinstatement to the practice of law. Accordingly, the board recommended that respondent be suspended for two years and one day, with one year deferred.
One board member dissented, on the ground that the sanction recommended by the disciplinary board is too severe.
Both respondent and the ODC filed objections to the disciplinary board's recommendation. Accordingly, the case was docketed for oral argument pursuant to Supreme Court Rule XIX, § 11(G)(1)(b).

DISCUSSION
Bar disciplinary matters come within the original jurisdiction of this court. La. Const. art. V, § 5(B). Consequently, we act as triers of fact and conduct an independent review of the record to determine whether the alleged misconduct has been proven by clear and convincing evidence. In re: Quaid, 94-1316 (La.11/30/94), 646 So.2d 343; Louisiana State Bar Ass'n v. Boutall, 597 So.2d 444 (La.1992). While we are not bound in any way by the findings and recommendations of the hearing committee and disciplinary board, we have held the manifest error standard is applicable to the committee's factual findings. See In re: Caulfield, 96-1401 (La.11/25/96), 683 So.2d 714; In re: Pardue, 93-2865 (La.3/11/94), 633 So.2d 150.
The instant case is unique because the conversations between respondent and Ms. Wattigney upon which the formal charges are based were tape recorded. These tapes were introduced into evidence and respondent stipulated to their authenticity. We have reviewed the tapes and other evidence in the record and conclude they demonstrate the ODC proved the formal charges against respondent by clear and convincing evidence. Accordingly, the sole issue presented for our consideration in this case is the appropriate sanction for respondent's misconduct.
In considering that issue, we are mindful that the purpose of lawyer disciplinary proceedings is not primarily to punish the lawyer, but rather to maintain appropriate standards of professional conduct to safeguard the public, to preserve the integrity of the legal profession, and to deter other lawyers from engaging in violations of the standards of the profession. Louisiana State Bar Ass'n v. Guidry, 571 *76 So.2d 161 (La.1990). The discipline to be imposed depends upon the facts of each case and the seriousness of the offenses involved, considered in light of any aggravating and mitigating circumstances. Louisiana State Bar Ass'n v. Whittington, 459 So.2d 520 (La.1984).
In determining the seriousness of respondent's offense, we find it helpful to review the prior jurisprudence of this court involving similar misconduct. As the disciplinary board recognized, the facts of In re: Ashy, 98-0662 (La.12/1/98), 721 So.2d 859, and In re: Gore, 99-3213 (La.1/28/00), 752 So.2d 853, present the closest similarities to the instant case.
In Ashy, the lawyer falsely advised his female client that she might be the subject of a criminal investigation. During a meeting with the client, the lawyer told her that she was "very attractive," asked if she "minded" if he "hit on her," and kissed her without her consent. At a later meeting, the lawyer told the client that he wanted to have a sexual relationship with her. He kissed her, touched her breast and buttocks, and placed her hand on his crotch. He also gave her some money to buy lingerie and a dress to wear to his office. He told the client that if she did not sleep with him he would do what he could to help her, but he couldn't guarantee results; however, if she did sleep with him, "everything would disappear." The client eventually learned that no warrant was going to be issued for her arrest and filed a complaint against respondent with the ODC.
We determined the lawyer's conduct violated Rule 2.1, because his sexual overtures to his client threatened his ability to exercise independent professional judgment and render candid advice. Likewise, we identified a violation of the conflict of interest provisions in Rule 1.7(b), as the lawyer placed his own interests ahead of his client's interests by refusing to put forth his best efforts unless the client responded to him sexually. After conducting a detailed analysis of Louisiana jurisprudence as well as the cases of our sister states, we noted that courts have imposed a wide range of discipline in similar cases of sexual misconduct, ranging from public reprimands to disbarment. We concluded the appropriate sanction for the lawyer's misconduct in Ashy was a two-year suspension.
In Gore, the lawyer entered into a consensual sexual relationship with a female client whom he subsequently represented in a divorce proceeding. Although the client desired the divorce (which was uncontested by her husband) and consented to respondent's representation, the lawyer admitted that he failed to discuss with his client the conflict of interest presented by their relationship. We accepted a petition for consent discipline and imposed a six-month suspension, followed by a two-year period of probation.
Although respondent's misconduct is not identical to the misconduct at issue in either Ashy or Gore, those cases provide us with some guidance. As in Gore, respondent and Ms. Wattigney had a prior consensual sexual relationship, although this relationship had terminated by the time of the instant misconduct. As in Ashy, there is an element of coercion in respondent's implied threat that he might cease to represent Ms. Wattigney if she did not submit to the "sex as a penalty" arrangement; however, unlike Ashy, respondent never threatened to limit his efforts on his client's behalf if she refused to engage in a sexual relationship with him. Indeed, respondent correctly points out he ultimately withdrew his request for sex and continued to represent Ms. Wattigney in her criminal case until it was concluded to her satisfaction.
*77 Nonetheless, as we observed in Ashy, the particular evil that results from a lawyer's sexual relationship with a client is the loss of emotional detachment which in turn threatens the objectivity and reasonableness that form the basis of the lawyer's independent professional judgment. Ashy, 98-0662 at p. 15, 721 So.2d at 867 (quoting Annotations to Model Rule 2.1). The potential for harm which results whenever a lawyer allows his personal interests to conflict with his client's interests is so great that any such violation must be viewed as being very serious, even if actual harm is not readily identifiable. The baseline sanction for this misconduct is a suspension from the practice of law.
As aggravating factors, we recognize respondent's dishonest or selfish motive and substantial experience in the practice of law. In mitigation, we recognize the absence of a prior disciplinary record, respondent's cooperative attitude toward the proceedings, and remorse.
Considering the facts of this case, we find the appropriate sanction for respondent's misconduct is a two-year suspension from the practice of law. However, in light of the mitigating factors, we will defer all but one year and one day of the suspension. This will necessitate respondent's application for reinstatement under Supreme Court Rule XIX, § 24 and thus permit this court to determine whether he has sufficient integrity to return to the practice of law.

DECREE
Upon review of the findings and recommendations of the hearing committee and disciplinary board, and considering the record, briefs, and oral argument, it is ordered that Robert T. DeFrancesch, Louisiana Bar Roll number 4802, be suspended from the practice of law in Louisiana for a period of two years, with all but one year and one day deferred. This suspension shall be retroactive to February 4, 2004, the date of respondent's interim suspension. All costs and expenses in the matter are assessed against respondent in accordance with Supreme Court Rule XIX, § 10.1, with legal interest to commence thirty days from the date of finality of this court's judgment until paid.
WEIMER, J., dissents and assigns reasons.
WEIMER, J., dissenting.
I agree the respondent should be sanctioned, but dissent regarding the severity of the sanction imposed by the majority.
In this matter, one day makes a difference because the respondent must re-apply for admission to the bar if the suspension exceeds one year. This makes the sanction too harsh. I cannot and do not condone his behavior which was wrong and unconscionable. The respondent has acknowledged this.[1] However, the parties had engaged in consensual sexual relations previously. Additionally, the fact of the matter is the respondent called off this suggested encounter.
*78 I suggest the respondent made a terrible error of judgment from which he withdrew before the suggested rendezvous occurred. Disciplinary board member, Billy R. Pesnell, dissented and assigned reasons, stating:
The facts found by the Hearing Committee, and affirmed by the Board, show that the Complainant agreed to have sexual relations with Respondent as a "late fee" or "penalty," at Respondent's suggestion, on October 19, 2001. Respondent's suggestion (or demand) was voluntarily dropped by Respondent three days later on October 22, 2001, without any sexual relations having occurred. Thus, Respondent did not in fact use his position as attorney to coerce sex or money from Complainant. The evidence does not show that Respondent received an "unreasonable fee" in violation of Rule 1.5 or consummated a business transaction in violation of Rule 1.8.
Moreover, it is clear from the Board's findings that Respondent and the Complainant had consensual sexual relations on several occasions before the attorney-client relationship on which the disciplinary charges are based was established. The Board, however, ignores that material in its analysis. It has been widely recognized that "... the principal danger of conflict in sexual relationships is pressure applied against a vulnerable client; that risk is plainly lower where the relationship is a preexisting one." (Emphasis added.) Hazard & Hodes, 1 The Law of Lawyering, (3 ed.2003), § 11.18, Note 3, pp. 11-75. There was a pre-existing relationship here. In addition, the Hearing Committee expressly refused to find that the Complainant was vulnerable. The Board does not find that the Hearing Committee's conclusion in this respect is manifestly erroneous.
Finally, neither the Hearing Committee or the Board has made any finding, nor is there any suggestion by ODC, that the quality of the professional services provided by Respondent in handling the Complainant's case was impaired by the potential conflict or was sub-standard in any way. See People v. Zeilinger, 814 P.2d 808 (Colo.1991).... While Respondent's suggestion that the Complainant should pay a "penalty" or "late fee" in the form of sex is undoubtedly reprehensible, it was not dishonest. Nor is there any proof that Respondent's misconduct prejudiced the administration of justice in any way. There is no evidence that Respondent delayed the disposition of the case or threatened to limit his legal services in order to coerce Complainant's consent to a sexual relationship. Consequently, I do not believe there is any basis for the Board's conclusions that Respondent violated Rule 8.4(c) and Rule 8.4(d). Certainly, ODC has not established these alleged violations with clear and convincing clarity. [All emphasis in original; internal footnotes omitted.]
Mr. Pesnell concluded that respondent's primary rule violations involve rules 1.7(b) (conflict of interest) and 2.1 (independent advisor). These violations lasted for a total of four days from the day respondent first suggested sex as a late fee until the day he voluntarily dropped his demands. While the potential conflict and breach of fiduciary duty threatened harm to both the complainant and the legal system, there is no proof that any actual harm resulted from respondent's overtures, outside of the emotional trauma and indignity suffered by the complainant.
Any trauma to the complainant in this case is mitigated by the fact the parties had previously had consensual sexual relations *79 and by the fact she considered the respondent a "friend" and wanted to drop the charges. When asked by the commission why she wanted to drop the charges, the complainant replied:
Well, the fact I'm, he's a great guy, you know. We were friends before. I don't want this to happen to him. It's his livelihood and, you know he's a friend of mine. I was nervous and scared at the time. I just want to drop the charges because I feel like, you, it's over with, what was said was said, and I wouldn't want this to go further.
The punishment suggested by the Hearing Committee, which had the advantage of seeing the attorney and the complainant testify, would adequately serve the ends of justice. The committee found the following undisputed mitigating factors present: absence of a prior disciplinary record, remorse, and a cooperative attitude toward the proceedings. The committee recommended that respondent be suspended for two years with all but one year deferred, conditioned upon a two-year period of probation. I agree with the recommendation of the Hearing Committee.
NOTES
[1] Respondent and the ODC filed a joint motion for interim suspension pursuant to Supreme Court Rule XIX, § 19.3, based on respondent's conduct in the instant case. We granted that motion on February 4, 2004. In re: DeFrancesch, 04-0245 (La.2/4/04), 865 So.2d 693.
[2] The extent of the financial assistance is unclear. Respondent testified that he gave Ms. Wattigney a total of three or four hundred dollars during the relationship, in response to Ms. Wattigney's requests for help paying her utilities and other living expenses. Ms. Wattigney, on the other hand, testified that respondent gave her several hundred dollars each time they had sex because "I was having problems with my boyfriend and I needed money, and he had it, so I just set a price and it was okay."
[3] The trial court sentenced Ms. Wattigney to serve two years in prison, suspended, and placed her on active probation for a period of two years.
[4] Respondent asserts that in light of Ms. Wattigney's testimony, the ODC should not have pursued the matter further. However, Supreme Court Rule XIX, § 18(H) plainly provides that "[n]either unwillingness nor neglect of the complainant to sign a complaint or prosecute a charge ... shall, in itself, justify abatement of the processing of any complaint."
[1] Respondent explained:

The remorse is total and complete. Nothing  you can hurt me in ways that  you can punish me, punish me for what I did in other ways, but I really don't believe you all can punish me more than I've punished myself over the last years over the stupidity. There's no excuse for it.... I'm hoping after this is over I can tell Nicole how sorry I am too, that this ever happened. The remorse is totally complete.... Nothing like this has ever happened, it will never happen again, and it was a combination of circumstances that came together and I reacted totally inappropriately to those situations and circumstances, and I apologize to the committee and to the other members of the Bar for having you all here today.